EUGENE J. URICOLI, APPELLANT, v. THE BOARD OF TRUSTEES, POLICE AND FIREMEN'S RETIREMENT SYSTEM, RESPONDENT.

Argued November 17, 1981—Decided August 5, 1982.

*Malcolm H. Greenberg* argued the cause for appellant (*Greenberg & Frese*, attorneys).

*Sharon M. Joyce*, Deputy Attorney General, argued the cause for respondent (*James R. Zazzali*, Attorney General of New Jersey, attorney; *Erminie L. Conley*, Assistant Attorney General, of counsel).

The judgment of the Court was delivered by

HANDLER, J.

Petitioner Eugene J. Uricoli was first employed as a patrolman by the Police Department of the City of Orange in November 1952. He worked his way up through the ranks and was

appointed Police Chief in 1970. On April 9, 1976, after over 23 years of otherwise honorable service with the police force, Uricoli was found guilty of one count of malfeasance in office.

The conviction was for a single ticket-fixing incident that had occurred during October 1972. The allegation was that Uricoli had illegaly disposed of a careless driving ticket that had been issued to the son of a "near and dear friend." Uricoli's assertion that he received no compensation for fixing the ticket was not then, nor has it ever been, challenged by the State.

Uricoli was eventually sentenced to a one-year suspended jail term and to probation for two years unless and until he paid a fine of $1,000. The trial judge who heard Uricoli's case expressly stated that he decided to suspend the custodial portion of the sentence because "[c]onviction of a crime as to this defendant in itself is punishment. No rehabilitation is necessary nor any need for deterrence ... His loss of standing in the community and subsequent loss of respect should suffice." In addition to the punishment meted out by the trial court, Uricoli was also dismissed from the Orange Police Department as a result of the conviction.

In June 1979, at which time Uricoli was 49 years old, he submitted an application to the Police and Firemen's Retirement System (PFRS) for an accidental disability retirement. He claimed entitlement to accidental disability benefits under *N.J. S.A.* 43:16A–7 because of various back injuries he had suffered between 1963 and 1972 while doing routine police work. The Board of Trustees of PFRS denied the application, ruling that Uricoli's conviction for malfeasance in office prevented him from meeting the prerequisite of honorable service for a pension.

Uricoli appealed the Board's ruling and a hearing was held before an Administrative Law Judge, who recommended denial of the pension. The Board of Trustees adopted the ALJ's findings, conclusions, and recommendations and reaffirmed its decision to deny Uricoli a pension because of his conviction. The

Appellate Division affirmed. We granted Uricoli's petition for certification. 87 *N.J.* 404 (1981).

Uricoli contends that his claim to pension benefits is predicated upon the accidental disability provisions of *N.J.S.A.* 43:16–2 and 43:16A–7. He argues that because the provisions relating to retirement on account of accidental disability contain no express requirement of honorable service as a prerequisite to obtaining a pension, his failure to have served honorably should not defeat his entitlement to a pension based upon his employment-related disability.

This argument is without merit. This Court has clearly reaffirmed the rule that honorable service is an implicit requirement of every public pension statute, whether or not this conditional term appears in the particular statute. See *Masse v. Public Employment Retirem. Sys.*, 87 *N.J.* 252, 255–56 (1981); *Makwinski v. State*, 76 *N.J.* 87, 90 (1978). Courts in this State have consistently imputed to the Legislature the intent that a public employee's right to pension benefits be conditioned upon honorable service.[1] The condition of honorable service is applicable without regard to whether retirement is based on disability, age or length of service.

The issue to be addressed in this case is whether only one incident involving an illegal disposition of a traffic ticket, for no personal gain and after 20 years of flawless service, is an infraction of sufficient magnitude to render the employee's career in the public service dishonorable so as to require the forfeiture of all pension benefits.

---

[1]The pension statutes covering policemen and firemen expressly require that service be honorable in order to be creditable for ordinary retirement. *N.J.S.A.* 43:16A–1 *et seq.* However, the express inclusion of such a term does not require that it be accorded special interpretative weight. We have held that honorable service is implicit in all pension statutes as a condition precedent to obtaining pension benefits. *Masse v. Public Employees Retirem. Sys.*, 87 *N.J.* 252, 255–56 (1981). See also *Ballurio v. Castellini*, 29 *N.J.Super.* 383, 389 (App.Div.1954) (though only nine of sixty pension statutes required honorable service, honorable service is implicit in every such pension statute).

The interpretation and application of the forfeiture doctrine as a substantive component of the State's public pension systems has been evolutionary in character. For the most part, the impetus has been judicial. In this process the courts have sought to effectuate the underlying intention of the Legislature. Understandably, the judicial development of the forfeiture doctrine has reflected in some measure the courts' perceptions of legislative policy regarding pensions and related subjects.

Many cases addressing the expressed or implied requirement of honorable service strongly suggest that automatic forfeiture was required whenever the public employee had committed any sort of misconduct in office, regardless of its nature or the degree of culpability. See *Plunkett v. Pension Commissioners of Hoboken*, 113 *N.J.L.* 230, 233–34 (Sup.Ct.1934), aff'd o.b., 114 *N.J.L.* 273 (E. & A. 1935); *Fromm v. Bd. of Directors of Police, etc., Retire. Syst.*, 81 *N.J.Super.* 138 (App.Div.1963). See *Masse*, 87 *N.J.* at 264 (characterizing the doctrine historically as a "judicially-created rule that automatically imposes an inflexible, arbitrary forfeiture" upon public employees).

A brief review of the cases, however, demonstrates that the courts were cognizant of the varying, and somewhat conflicting, objectives inherent in the public pension system and the consequent need to weigh the quality of misconduct to determine whether forfeiture of pension benefits was appropriate. The gravity of the misconduct usually was a relevant consideration. Misconduct that resulted in a forfeiture frequently constituted a substantial breach of public employee duties. See, *e.g., McFeely v. Board of Pension Com'rs*, 1 *N.J.* 212 (1948) (retired police chief's pension benefits vacated pending disposition of charges that he had not enforced statutes against gambling and that he, along with seven fellow officers, committed a conspiracy to "oppress" and "persecute" other members of the police force); *Plunkett*, 113 *N.J.L.* 230 (fireman's pension forfeited where he had pled guilty to several charges of misconduct including, among others, embezzlement of funds from the Firemen's Relief Association); *Hozer v. State, etc., Police & Firemen's Pension*

*Fund,* 95 *N.J.Super.* 196 (App.Div.1967), certif. den., 50 *N.J.* 285 (1967) (policeman's pension application denied where he had been convicted of nonfeasance in office that had extended over a five-year period and consisted of the knowing nonperformance of his duties regarding two premises on which bookmaking was being conducted and allowing the persons responsible therefor to escape apprehension and punishment); *Pfitzinger v. Bd. of Trustees, etc., Retirement System,* 62 *N.J.Super.* 589 (Law Div. 1960) (highway department inspector's pension application denied upon conviction of at least 26 charges of misconduct in office extending over more than a five-year period and including such offenses as falsifying work reports, drinking during work hours and committing certain acts that would constitute the crime of extortion); *Mount v. Trustees of Pub. Emp. Retirement Syst.,* 133 *N.J.Super.* 72 (App.Div.1975) (county engineer's pension properly suspended pending disposition of indictments for extorting money from a contractor during his employment). See *Pangburn v. Ocean City Police, etc., Commission,* 136 *N.J.L.* 501, 502 (Sup.Ct.1948) (policy of legislature is manifest that conduct of a member of the police department in violation of departmental rules is not to be considered as amounting to dishonorable conduct so as to deprive such member of his pension privileges). But see *Fromm,* 81 *N.J.Super.* 138 (although policeman was originally charged with 25 counts of altering and downgrading traffic tickets, his pension was nonetheless forfeited despite the fact that he was ultimately convicted only of two counts). The cases focused generally on two dimensions of employment conduct that can result in forfeiture, namely, the degree to which the misconduct "touches the administration of the public employee's office or position" and the degree of culpability or "moral turpitude" evident in the misconduct. *Gauli v. Trustees Police & Firemen's Ret. Syst.,* 143 *N.J.Super.* 480, 482 (App.Div.1976).

The most recent decisions of this Court expressly embrace a more flexible approach in determining whether the character of misconduct of public employees will justify the deprivation of

pension benefits. In *Masse*, for example, the Court concluded that unless the criminal misconduct was in fact directly related to the employment duties of the public employee, there should be no forfeiture of accumulated pension benefits. We found "nothing implicit in the nature of a public pension or a prerequisite of honorable service that mandates disqualifying service upon conviction of a crime involving moral turpitude unrelated to the public employment." 87 *N.J.* at 261–2. This point was given added emphasis in the companion decision of *Procaccino v. Public Employees' Retirem. Sys.*, 87 *N.J.* 265 (1981). There the crime committed by the public employee was not directly related to his actual employment duties, although the quality of his misconduct—misappropriating public funds in an unrelated job—was highly relevant to his general qualifications or fitness to hold public office. Nevertheless, the absence of a direct and actual relationship between the misconduct and the performance of the employee's specific public duties did not warrant the forfeiture of pension benefits. *Id.* at 268.

In *Makwinski*, we concentrated upon the nature of the misconduct committed in terms of moral turpitude. There was a direct and actual relationship between the employee's public duties and the particular act of misconduct. Nevertheless, the absence of serious culpability or substantial gravity overcame any asserted need to impose a forfeiture. We held that the employee's "motive and intent must be weighed in the balance," and that where there was a purpose to help others and there was no venality or personal gain from the act, the crime of misconduct in office should not be characterized as one of "moral turpitude," at least for pension purposes. 76 *N.J.* at 91–2. Accordingly, we ruled that forfeiture of pension benefits was not required.

The springboard for the courts' original formulation of the forfeiture rule was its perception of the Legislature's purpose in providing pensions for public employees. Thus, it was believed that the public pension was integrally related to the public employment and, since public employment encompasses a public

trust, there is a fiduciary relationship between the public and the employee. Implicit in this trust relationship is honorable service. If the employee is guilty of dishonorable service, it follows under this view that he breaches the public trust and forfeits his entitlement to a pension. *Plunkett,* 113 *N.J.L.* at 233–34.

It has also been recognized that one of the "fundamental purposes" underlying the pensioning of civil servants is to "secure good behavior and the maintenance of reasonable standards of discipline during service." *Id.* at 233. *Ballurio v. Castellini,* 29 *N.J.Super.* at 389; *Hozer,* 95 *N.J.Super.* at 199– 200; *Mount,* 133 *N.J.Super.* at 79–82. Forfeiture in this context has been viewed as within the Legislature's intendment to establish both a deterrent against committing misdeeds related to employment and as an inducement to continued faithful, diligent and efficient public service. *Masse,* 87 *N.J.* at 257.

The notion that the pension scheme can be legitimately used as a punitive tool or incentive in order to ensure good service has as its natural corollary that there could be no contractual entitlement or irrevocable vesting of pension benefits. See, *e.g., Ballurio,* 29 *N.J.Super.* at 389. However, the countervailing view that there is a contractual basis to one's pension has also claimed some adherents and has emerged as a formidable, competitive concept. In this regard, this Court has noted that:

> [t]he basic philosophy underlying pensions to public officers fluctuates between the early view that they were mere gratuities bestowed by the sovereign in recognition of meritorious service previously rendered and the more modern concept that they are some form of delayed wages or salary to compensate the employee during his declining years ... for his long and faithful service. [*Watt v. Mayor and Council of Borough of Franklin,* 21 *N.J.* 274, 279 (1956)]

Compare *Salz v. State House Commission,* 18 *N.J.* 106, 111–12 (1955) (a pension is an allowance or stipend in consideration of past services), with *Ballurio,* 29 *N.J.Super.* at 389 ("A pension is a bounty springing from the appreciation and graciousness of the sovereign").

■ Thus, another fundamental purpose underlying the enactment of pension statutes—a purpose expressed and embraced with increasing frequency—is that they are contractual in nature and constitute deferred compensation for services rendered. In this context, a pension can be viewed as "an element in encouraging qualified individuals to enter and remain in public service." *Masse*, 87 *N.J.* at 261. See generally *id.* at 259–62; *Geller v. Dept. of the Treasury of New Jersey*, 53 *N.J.* 591, 597–98 (1969). This view of a pension as deferred compensation, designed to induce individuals to enter public service through its guarantee of payment for services and retirement security, has led some courts to regard pensions as a vested contractual right, with such benefits to be subject to forfeiture only where the Legislature clearly provided for that result. See, *e.g., Willens v. Commission on Judicial Qualifications*, 10 *Cal.*3d 451, 516 *P.*2d 1, 4–5, 110 *Cal.Rptr.* 713, 716–17 (1973); *Dorsey v. State of Delaware*, 283 *A.*2d 834 (Del.1971). *Cf. Burello v. Com., State Emp. Retirement System*, 49 *Pa.Cmwlth.* 364, 411 *A.*2d 852 (1980) (Public Employee Pension Forfeiture Act violated constitutional provisions prohibiting impairment of contracts and ex post facto laws where it retroactively mandated that vested pension benefits being received by retired public employee would be forfeited upon conviction of federal extortion charges that were related to his former employment); *City of Frederick v. Quinn*, 35 *Md. App.* 626, 371 *A.*2d 724, 726 (1977) (future benefits under noncontributory policy pension plan vested as they were pro ratedly earned and city had no right unilaterally to withdraw retroactively the pro rata pension benefits that had accrued); *Leonard v. City of Seattle*, 81 *Wash.*2d 479, 503 *P.*2d 741 (1972) (statute that operated to deprive retired police officer of pension benefits as a result of his felony conviction occurring after his retirement was unconstitutional under provision that no conviction shall work a forfeiture of estate).

This Court has refrained from embracing exclusively either major view as to the nature of a public pension. Chief Justice Weintraub, writing for the majority in *Spina v. Consolidated*

*Police, etc., Pension Fund Com.*, 41 *N.J.* 391, 401–02 (1964), described pension benefits as follows:

> [T]here is no profit in dealing in labels such as "gratuity," "compensation," "contract," and "vested rights." None fits precisely, and it would be a mistake to choose one and be driven by that choice to some inevitable consequence. Government's contribution to a pension fund has several facets. In part it compensates for services already rendered ... Yet it can be viewed also as noncompensatory payment to further the public employer's own interests, *i.e.*, to permit the employer to release an aged servant who cannot decently be let out if he is unable to meet the necessities of life ....
>
> As to the employee's contribution, it seems to be a sum already earned. Yet it is earned with a string ... [T]he Legislature need not provide that the contribution must be returned upon cessation of employment ... Thus the employee's contribution, even though taken from his pay, is something he never had in hand and could not insist upon receiving.

Consequently, the approach required in ascertaining the pension consequences of misconduct by public employees is one which incorporates and reflects the statutory purposes served by public pensions. In *Masse*, Justice Schreiber meticulously identified the major elements of legislative policy regarding the State's public pension systems which are relevant in the determination of legislative intent concerning the forfeiture of pension benefits. He emphasized particularly the compensatory nature of a public pension, the vesting provisions of such pensions and the parallel to be found in private pension plans governed by the Employment Retirement Income Security Act (ERISA), 29 *U.S.C.A.* § 1053. 87 *N.J.* 259–60. He also noted the judicial recognition of the compensatory aspects of public pensions as a significant legislative objective sought to be achieved in the administration of the pension systems. *Id.* at 260–61. It is apparent, then, that there is a current, ongoing evolution away from the concept of a pension simply as a gratuitous benefit and toward an acceptance of it as deferred compensation for public employees upon retirement.[2] See Note, "Public Officials

---

[2]This evolving recognition of the new character of public pension benefits is particularly evident in the private sector. In fact, the contrast between the *Plunkett* rule and provisions governing pensions in the private sector is sharp. See the Internal Revenue Code (26 *U.S.C.A.* § 411(a)(3)) and the Employee

and Employees," 11 *Seton Hall L. Rev.* 599, 606 (1981) ("In this era of comprehensive pension programs, it is difficult to conceive of retirement benefits as rewards;" rather, there is a definite "need of public employees to feel secure in their provisions for the future"). See also *Makwinski,* 76 *N.J.* at 94–98 (Conford, P.J.A.D., concurring).

Another relevant legislative policy reflected in the State's public pension systems is its importance as a term and condition of public employment. Public pensions provide public employees with employment stability and financial security. Public pensions are not subject to change through collective employment negotiations under the New Jersey Employer-Employee Relations Act, *N.J.S.A.* 34:13A–8.1. It may be inferred that the removal of public pensions from the arena of mandatory negotiations concerning terms and conditions of employment between public employees and the State not only protects the fiscal integrity of the pension systems but assures public employees that their entitlement to pension benefits is secure and should not be threatened by the vagaries of labor negotiations. See *Masse,* 87 *N.J.* at 261.

It is also appropriate to consider some of the ways in which the Legislature has seen fit to deal expressly with the subject of pension forfeitures in determining its underlying intent with respect to forfeiture in situations not explicitly provided. The

---

Retirement Income Security Act (ERISA) (29 *U.S.C.A.* § 1053). With respect to private sector pensions, benefits attributable to employee contributions are never forfeitable. Those attributable to employer contributions are forfeitable only under very limited circumstances, none of which involve employee misconduct. For example, the overwhelmingly significant national public policy of secure retirement income renders void any attempt to declare a forfeiture of a vested interest in a profit sharing trust despite the existence of an explicit provision for forfeiture if the employee engages in competitive employment after leaving the particular job. See *Ellis v. Lionikis,* 152 *N.J.Super.* 321 (Ch.Div.1977), aff'd, 162 *N.J.Super.* 579 (App.Div.1978). This result is concomitantly a direct outgrowth of the dominant emerging vision of pensions as deferred compensation for services already rendered. See *Masse,* 87 *N.J.* at 260.

subject of pension forfeiture for misconduct is expressly treated in the pension statutory scheme. *N.J.S.A.* 43:15A–38, the provision applicable generally to employees who are members of the Public Employees' Retirement System, provides that early retirement benefits—*i.e.*, those normally obtainable upon the employee's option after having completed 15 years of service— are not available to an otherwise qualified employee who was "removed for cause on charges of misconduct or delinquency." [3] Similarly, *N.J.S.A.* 43:16A–11.2, applicable particularly to policeman and fireman, contains similar language.[4] On the other hand, *N.J.S.A.* 43:16–1, dealing broadly with retirement after 25 years of honorable service and upon having reached the age of 60 years, does not contain any similar provision for forfeiture. This is similar to *N.J.S.A.* 43:16–2, which governs this case and may be compared to *N.J.S.A.* 43:16A–23, providing that no member who has completed 25 years of honorable service and who has attained 55 years of age "shall be deprived of his pension privileges under this act because of any violation of the rules and regulations established for the government of such department." [5]

---

[3]Of some significance, the statement accompanying *L.* 1954, *c.* 84, the source statute of this provision, said of it only that "the bill provides for ... the vesting of the members' interest in the State's contributions after 20 years of service." (The number of years of required service was reduced, by *L.* 1966, *c.* 217, § 6, to 15.) Thus, even a provision that is facially proforfeiture has within it the more recent strands of thought regarding pension as deferred compensation and therefore capable of being vested. See *Masse*, 87 *N.J.* at 260.

[4]It is therefore evident, in light of this express provision for forfeiture in the case of an employee who seeks early retirement benefits and who was removed "for cause or charges of misconduct or delinquency," that Uricoli is ineligible to obtain pension benefits under this provision. This fact does not, of course, preclude his success in obtaining benefits under *N.J.S.A.* 43:16A–7, the provision dealing with disability benefits.

[5]It is clear that the Legislature may have had rational reasons for singling out early retirement benefits as the only occasion on which to attach a provision for forfeiture. As we recognized in *Masse*, with respect to miscon-

In addition to these provisions in the pension statutes dealing with forfeiture, the Legislature has elsewhere considered forfeiture as it relates to public employment. The New Jersey Code of Criminal Justice, *N.J.S.A.* 2C:1–1 *et seq.*, expressly covers a public employee who has committed a misdeed in connection with his public office. *N.J.S.A.* 2C:51–2 a(1)–(2) states that any public officer or employee who is convicted of an offense involving dishonesty, of a crime of the third degree or above, or of an offense "involving or touching" upon his office, position or employment, shall forfeit his office or position. Moreover, subsection c provides that, in addition to the prescribed punishment and forfeiture, any person convicted of an offense involving or touching on his public office "shall be forever disqualified from holding any office or position of honor, trust or profit under this State or any of its administrative or political subdivisions." As we stated in *Masse*, 87 *N.J.* at 262, "[t]hese sections indicate that the Legislature has selected the penalties to be imposed upon public employees for offenses and crimes."

The existence of statutory sections containing forfeiture provisions is clear evidence that the Legislature was well aware of how to provide for a forfeiture where it intended to do so.

---

duct unrelated to the employment, if it is incongruous to declare a forfeiture of pension for employees who have committed certain misdeeds, that "incongruity is heightened when the public employee continues ... to render service that was creditable for pension purposes after the conviction." *Masse*, 87 *N.J.* at 264. Thus, the early retirement forced by removal for cause differs from the case of an employee who has retired in due course and is subsequently found to have committed a misdeed. In the latter case, an employee could well have rendered numerous years of faithful and diligent service after a prior infraction. To punish both equally could well operate to remove an inducement, through its deterrent impact on others, to render future honorable service after having made one early mistake. Perhaps more importantly, the additional sanction of forfeiture seems all the more harsh where the employee's single mistake was potentially sandwiched in the middle of over 25 years of exemplary service as opposed to at the end of only 15 years. Moreover, the need for punishment—concededly a primary goal of the forfeiture—is also proportionately reduced where the employee has rendered more years of faithful and diligent service.

Furthermore, penal statutory sanctions for improper official conduct are "fully covered by the penal code." *Masse*, 87 *N.J.* at 264. Consequently, to read into the remaining, silent sections of the pension statute a mandatory and automatic forfeiture upon the commission of misconduct, simply because it is related to the employment, is not warranted in the absence of a definitive legislative expression or clear indication that such an interpretation comports with and is essential to effectuate legislative intent. *Id.; Willens*, 110 *Cal.Rptr.* at 716–17. See Note, 11 *Seton Hall L. Rev.* at 606–09.

Finally, in attempting to fathom the presumed legislative intent underlying the pension forfeiture doctrine at the present time, we must accommodate two interpretive predelictions, each of which militates strongly against forfeiture. One is that forfeiture—whether of one's pension or any other property or benefit to which one is otherwise entitled—is a penalty or a punishment for wrongful conduct. *Stapleton v. Two Million Four Hundred Thirty-Eight Thousand, One Hundred and Ten Dollars*, 454 *F.*2d 1210, 1216 (3 Cir. 1972) *cert.* den. *sub nom. Stapleton v. United States*, 409 *U.S.* 894, 93 *S.Ct.* 111, 34 *L.Ed.*2d 151 (1972) (citing New Jersey law). As such, "[a]ll elements of doubt must be resolved in favor of the person against whom the forfeiture is sought." *State v. LaBella*, 88 *N.J.Super.* 330, 338 (Law Div. 1965). The second factor was emphasized by Justice Schreiber in *Masse*, 87 *N.J.* at 259. He stressed that a public pension, though compensatory in nature as well as an incentive for faithful future service, is "remedial in character ... [and] should be liberally construed and administered in favor of the persons intended to be benefitted thereby," quoting *Geller*, 53 *N.J.* at 597–98, and citing *In re Application of Smith*, 57 *N.J.* 368, 374 (1971); *Smith v. Consolidated Police & Firemen's Pension*, 149 *N.J.Super.* 229 (App.Div.1977), certif. den., 75 *N.J.* 8 (1977), and *In re Vaccora*, 131 *N.J.Super.* 264, 268 (App.Div. 1974), aff'd o.b., 66 *N.J.* 151 (1974).

■ In construing a statute in accordance with the underlying intention of the Legislature, we may properly take into account significant developments in legislative and public policy subsequent to the time of the original enactment. *Renz v. Penn Central Corp.*, 87 *N.J.* 437, 458–59 (1981). Such policy considerations have a material bearing upon the inquiry where it is reasonable to believe that the Legislature itself did not intend that its enactment be insulated from changing circumstances and contemporary social values, especially when these are reflected in its own current legislative actions. *Cf. id.* (refusing to attribute to the Legislature an intent that its original enactment remain impervious to the avulsive change in the law from contributory to comparative negligence). We cannot, therefore, attribute to the Legislature in the statutory creation of public pensions, an intent to impose and retain an inflexible forfeiture rule, itself the unique product of judicial interpretation. The rule that any public employee misconduct, though related to the performance of public duties, must result automatically in total forfeiture of all pension benefits, regardless of its gravity or the degree of personal culpability in comparison to an otherwise honorable public career is discordant with the times. We find no basis for believing that the absolute forfeiture rule is consistent with the Legislature's intent in providing public pensions in the context of contemporary public employment.

Our most recent cases demonstrate that the proper approach to the resolution of the problem of what constitutes dishonorable service justifying the forfeiture of earned pension benefits is one which calls for flexibility and the application of equitable considerations. We now hold that in all cases, even where there is a relationship between the particular misconduct at issue and the performance of employment duties, a balancing approach is required in order to determine whether forfeiture is justified under all of the circumstances.

■ The factors which must be considered and balanced in the application of such a flexible test should include such elements

as (1) the employee's length of service; (2) the basis for retirement, *i.e.*, age, service, disability, etc.; (3) the extent to which the employee's pension has vested; (4) the duties of the particular employment; (5) the employee's public employment history and record; (6) the employee's other public employment and service; (7) the nature of the misconduct or crime, including the gravity or substantiality of the offense, whether it was a single or multiple offense and whether it was continuing or isolated; (8) the relationship between the misconduct and the employee's public duties; (9) the quality of moral turpitude or the degree of guilt and culpability, including the employee's motives and reasons, personal gain, and the like; (10) the availability and adequacy of other penal sanctions; and (11) other personal circumstances relating to the employee bearing upon the justness of forfeiture.

These factors are illustrative of those which may properly be taken into account in determining the reasonableness of pension forfeiture. They must be balanced and then weighed in terms of the goals to be achieved under the pension laws. The balance to be achieved takes its bearings from the major purposes underlying public pensions—to induce people to enter public employment and continue faithful and diligent employment and to furnish public employees with employment stability and financial security.

In so holding, we recognize that we are striving to effectuate the intention of the Legislature. We emphasize that pension entitlement is in the legislative domain and that the subject is one which can be most appropriately addressed by the Legislature itself. The judicial course in the pension field in terms of the forfeiture doctrine has been long, uneven and somewhat uncertain, reflecting in large measure the vicissitudes of public policy and the shifting goals that are implicated in the pension laws.

In performing the requisite balance in Uricoli's case, we conclude that total forfeiture is not warranted. We do not

understate the wrongfulness of the particular infraction herein, *i.e.*, ticket fixing, or its direct and actual relationship to the performance of Uricoli's public duties. See *Fromm*, 81 *N.J.Super.* at 145. We do, however, note that he was convicted of having committed this wrongful act after 20 full years of honorable service. There is no evidence that the criminal conduct was pervasive or chronic. He was found guilty of only a single infraction. There was no continuing criminal scheme or any showing of extensive corruption or breach of trust. Moreover, the evidence on the record amply supports the fact that there was no personal gain obtained from the transaction. There was no indication of venality. Furthermore, adequate alternative penal sanctions were available and have been applied. The employee was terminated from public service and was convicted and sentenced for his crime. With these factors in mind, we conclude that his misconduct on balance should not result in the automatic forfeiture of all benefits. As was observed in the concurring opinion of Justice Pashman, joined by Justice Sullivan, in *Makwinski*, partial forfeiture of pension benefits should be admeasured as of the time of the wrongful conduct. 76 *N.J.* at 93. In this case, Uricoli seeks a pension based upon accidental disability. While the merits of this application have not been resolved, in no event should the calculation of service creditable toward such a pension include the service beyond October 1972, the date of Uricoli's misconduct, despite the actual employment termination date in 1976.

Accordingly, we reverse the judgment of the court below. The case is remanded to the Board of Trustees with directions to process Uricoli's application for accidental disability pension benefits.

PASHMAN, J., concurring.

I fully concur with the result and the reasoning of the majority opinion. I write merely to clarify my view of the basis for the Court's decision.

I agree with the majority that the law of forfeiture of public pensions has undergone significant change in recent years. *Ante* at 67–69. We have come to recognize the changing social role of pensions in modern times. They are no longer mere gratuities, nor are they luxuries. To most public employees, pensions represent a necessary form of deferred compensation designed to provide economic security in retirement. It therefore seems unfair to require total forfeiture of pensions for acts that are insufficiently grave or unrelated to one's public employment. To do so would violate our sense that employees are entitled to the compensation that they have earned through years of public service. Complete deprivation of pensions counted on to support public employees and their families during retirement years is a very harsh punishment.

On the other hand, it is unfair to use taxpayer's money to provide for individuals who have seriously abused their public trust. We sense that such compensation is undeserved. Yet this would be the result if pensions were indefeasibly "vested" after a certain number of years of service.

We have therefore rejected both these extreme positions. Instead we have devised a legal standard that can give some expression to both our conflicting ideas of fairness. As I stated in *Makwinski v. State*, 76 *N.J.* 86, 93 (1978) (Pashman, J., concurring):

> The paramount importance of public employees acting honestly in accordance with the public trust placed in them is self-evident. I fully support the rule that dishonorable service requires total forfeiture of pension rights, even one which has "vested" after 25 years of honorable service. However, Makwinski's service was not rendered dishonorable for purposes of this principle by this single, isolated improper act. Yet, plaintiff's misconduct was serious enough to require our strenuous disapproval, and we trust that our terminating plaintiff's accrual of pension rights as of the date of his misconduct some five years before he retired will make that point. In a different factual setting, a public employee should not expect to retain any part of his pension.

The Court's decision today adopts this fact-oriented approach. I agree that flexibility is the best way to satisfy our conflicting goals. In applying this balance, I agree with the Court's recognition that we have come to view pensions primarily as deferred

compensation, which should not be completely forfeited except in the most egregious cases. Whether misconduct in a given case rises to the level of "dishonorable service" should be determined on a case-by-case basis. The majority opinion develops reasonable standards to guide determinations of whether public pensions should be forfeited, partly or completely, by those who have not kept faith with their public responsibilities.

SCHREIBER, J., concurring.

I concur. Nothing barred Uricoli's right to claim accidental disability retirement benefits under *N.J.S.A.* 43:16A–7 in 1972 because of various back injuries he had incurred while doing routine police work prior to his misconduct. At the time of the traumatic events allegedly causing Uricoli's disability, all his service was honorable. I would permit that claim to be processed to determine whether Uricoli was eligible for and entitled to an accidental disability retirement allowance under the statutory requirements. I would reverse and remand for that purpose.

It should be noted that at the time of his misconduct Uricoli was not entitled to a pension. He had not attained age 55 and had fewer than 25 years of service. *N.J.S.A.* 43:16A–5, –11.1. Moreover, he did not qualify under *N.J.S.A.* 43:16A–11.2, permitting vesting after 15 years of service before age 55, if the employee's separation from service was not due to charges of misconduct. Therefore his entitlement to a pension is dependent on his disability claim.

O'HERN, J., dissenting.

The Court today sets an unfortunate standard for the conduct of public service in New Jersey. It holds that a police chief convicted of official misconduct is nonetheless entitled to be maintained on pension at public expense. For the reasons stated below, I respectfully dissent.

A more detailed understanding of the facts puts the case in better perspective. Eugene Uricoli had been on the City of

Orange police force since 1952. He was appointed Chief of Police in 1970 and continued as such until these events took place. In 1975, Uricoli became the subject of a grand jury investigation. This investigation led to *eight separate indictments* arising out of occurrences in the 1970's. One indictment charged misconduct in office in connection with the illegal disposition in 1972 of a careless driving ticket. There was no allegation that Uricoli sought or received any personal gain. On April 9, 1976, a jury found him guilty. Judgment of conviction and a sentence of one year and a $1,000 fine was entered on May 18, 1976. The custodial sentence was suspended. He was removed from office on June 7, 1976.

In stating his reasons for suspending custodial sentence, the judge said: "Conviction of a crime as to this defendant in itself is punishment. No rehabilitation is necessary nor any need for deterrence. Custodial treatment is not indicated. His loss of standing in the community and subsequent loss of respect should suffice." In January 1979, after final appellate review, the prosecutor made a motion to dismiss the remainder of the indictments, stating to the court that the ends of justice had been served by the conviction and sentence and because "more significantly, pursuant to New Jersey law, Eugene Uricoli was removed from office and lost all his pension rights." The motion was granted and the seven remaining indictments were dismissed on February 1, 1979.

Uricoli filed this application for a disability pension on June 19, 1979. His claim is for a prorated pension based on that portion of his tenure served without misconduct. After a hearing, Uricoli's application was denied by the Consolidated Police and Firemen's Pension Fund Commission on the ground that the requirement of "honorable service" had not been met.

The section of the retirement act under which Uricoli filed his application does not expressly recite that honorable service is a

qualification for benefits.[1]  However, it has been consistently held that an honorable service qualification is implicit in every pension act.  Unless this requirement is satisfied, no pension can be granted.  *Makwinski v. State*, 76 *N.J.* 87 (1978);  *Plunkett v. Pension Comm'rs of Hoboken*, 113 *N.J.L.* 230 (Sup.Ct.1934), aff'd o.b., 114 *N.J.L.* 273, 176 A. 341 (E. & A. 1935);  *Fromm v. Bd. of Directors of Police & Firemen's Ret. System*, 81 *N.J.Super.* 138 (App.Div.1963);  *Ballurio v. Castellini*, 27 *N.J.Super.* 113 (Law Div. 1953), aff'd, 29 *N.J.Super.* 383 (App.Div.1954).  The question then is whether Uricoli's conduct constitutes dishonorable service.

Two recent cases, *Masse v. Public Employees Retirement System*, 87 *N.J.* 252 (1981), and *Procaccino v. Public Employees Retirement System*, 87 *N.J.* 265 (1981), reviewed the history and policy of the honorable service requirement.  No further detailed review is needed.  In *Masse* and *Procaccino*, the Court held that conviction of a crime, even involving moral turpitude, does not result in forfeiture of vested pension rights *so long as the misconduct was unrelated to public employment*.  These cases emphasized that *honorable service* is the key element in determining pension eligibility.

Uricoli's unlawful disposal of a traffic summons directly touched upon the administration of his office and struck at the heart of the justice system he was sworn to uphold.  That Uricoli neither sought nor received any personal gain from his

---

[1] *N.J.S.A.* 43:16–2.  Retirement for disability

> Any member of such police or paid or part-paid fire department who shall have received permanent disability as a direct result of a traumatic event occurring while performing his regular or assigned duties shall be retired upon an accidental disability pension equal to ⅔ of his average salary....

> A member of any such department who shall have served honorably and who shall have become permanently and totally incapacitated for service for any cause other than as a direct result of a traumatic event occurring during the performance of duty, shall, upon approval of his application, or the application of his employer, be retired on a nonaccident disability pension equal to ½ of his average salary.

ticket fixing does not make it any the less dishonorable. The result of ticket fixing is to defraud the State. As such, it involves moral turpitude. "Evenhanded justice for all traffic violators was defeated." *Fromm*, 81 *N.J.Super.* at 145.

Uricoli's reliance on *Makwinski v. State, supra,* is misplaced. The Court held there, under a "unique" fact pattern, that a police chief's official misconduct did not constitute dishonorable service because it was prompted by his concern for the betterment of his community. In that case the police chief had permitted an on-duty officer to do carpentry work on a Knights of Columbus hall which was frequently used for public or governmental functions. No similar concern for the betterment of the community was urged at the pension hearing in this case. There can be no doubt that appellant's ticket fixing rendered his service dishonorable.

I am not unmindful of the personal suffering that results from a pension forfeiture. Appellant urged the Court to adopt a rule that would treat a public pension simply as a form of deferred compensation and to hold that a public employee does not, after dishonorable service, forfeit a pension once vested. The Court's opinion stops short of this and adopts a test "which calls for flexibility and the application of equitable considerations."

In *Eyers v. State of New Jersey, Bd. of Trustees Public Employees' Retirement System,* 91 *N.J.* 51 (1982), also decided today, I stressed in dissent that "[u]nder our pension laws both benefits and loss of benefits must be dispensed with an even hand." I doubt that there can be equal treatment for all under a discretionary rule of entitlement. I agree with the late Chief Justice Weintraub:

> ... [T]here is no profit in dealing in labels such as "gratuity," "compensation," "contract," and "vested rights." None fits precisely, and it would be a mistake to choose one and be driven by that choice to some inevitable consequence.
>
> Government's contribution to a pension fund has several facets. [*Spina v. Consolidated Police etc. Pension Fund Comm.*, 41 *N.J.* 391 at 401 (1964)].

One of those undoubted facets is the continued need to insure integrity in government:

> The rationale underlying these decisions is that a retirement pension is an inducement to conscientious and efficient public service which inducement would be immeasurably lessened if the employee could assert an indefeasible claim to the pension simply because the dishonorable conduct occurred after the employee had served the minimum number of years of service. *Plunkett, supra,* 113 *N.J.L.* at 232; *Ballurio v. Castellini,* 29 *N.J.Super.* 383, 389 (App.Div.1954). [*Makwinski,* 76 *N.J.* at 90].

In *Masse v. Public Employees Retirement System, supra,* this Court defined that facet of legislative purpose as involving a nexus between the dishonorable conduct and the public employment. Only when that nexus was absent[2] has the Court ever found that legislative intent did not require forfeiture. I see no reason to depart from that judgment here.

The Court's reliance in *Masse* and *Procaccino* on the new forfeiture provisions of *N.J.S.A.* 2C:51–2(a) reinforces my conclusion here. These provisions contain an "expressed legislative policy ... that offenses connected and related to public employment result in a greater sanction than when the offenses are not connected or related." *Masse,* 87 *N.J.* at 262.

Justice Pashman, concurring in *Makwinski,* emphasized the "paramount importance of public employees acting honestly in accordance with the public trust placed in them," 76 *N.J.* at 93, and reaffirmed support for the rule that "dishonorable service requires total forfeiture of pension rights, even one which has 'vested.'" *Id.* I would adhere to that established law and hold that the pension applicant, having been found guilty of dishonorable service, is not entitled to a prorated pension.

Chief Justice WILENTZ and Justice CLIFFORD join in this opinion.

---

[2]In *Masse,* the misconduct was a sexual offense by a municipal utilities employee; in *Procaccino,* it was misuse of funds as a part-time constable by a title examiner in the Department of Transportation.

PASHMAN and SCHREIBER, JJ., concurring in the result.