617 A.2d 1189

CLAUDE CORVELLI, PETITIONER–APPELLANT, v. BOARD
OF TRUSTEES, POLICE AND FIREMEN'S RETIREMENT
SYSTEM, RESPONDENT–RESPONDENT.

Argued September 30, 1992—Decided December 30, 1992.

*Samuel J. Halpern* argued the cause for appellant (*Susan J. Abraham,* of counsel and on the brief).

*Martin L. Wheelwright,* Deputy Attorney General, argued the cause for respondent (*Robert J. DelTufo,* Attorney General, attorney; *Mary C. Jacobson,* Deputy Attorney General, of counsel).

The opinion of the Court was delivered by

CLIFFORD, J.

We granted certification, 127 *N.J.* 562, 606 *A.*2d 373 (1992), to review the Appellate Division's determination, in an unreported opinion, upholding a denial of age- and service-retirement benefits for George Corvelli. (Because Corvelli died during the pendency of his appeal from the decision of the Board of Trustees of the Police and Firemen's Retirement System (Board), the Appellate Division substituted his adult son Claude as petitioner for the pension benefits. As used in this opinion, "petitioner" refers to George Corvelli.)

The court below agreed with the Board's conclusion that petitioner's conviction for weapons theft and his associated misconduct in office spanning two-and-a-half years demonstrated dishonorable service calling for a total forfeiture of his pension under *Uricoli v. Board of Trustees*, 91 *N.J.* 62, 449 *A.*2d 1267 (1982). Mindful of the limited scope of appellate review of an administrative agency's final decision, we agree with the Appellate Division that the Board's decision was neither arbitrary and capricious nor unsupported by substantial credible evidence. *See Public Serv. Elec. & Gas Co. v. New Jersey Dep't of Envtl. Protection*, 101 *N.J.* 95, 103, 501 *A.*2d 125 (1985). We therefore affirm.

I

In September 1955, George Corvelli began his career of public service as a patrolman with the Borough of Ridgefield. On that date, Corvelli enrolled in the Police and Fireman's Retirement System. He rose through the ranks of the department, becoming a sergeant in September 1969 and Chief of Police in December 1978.

The Borough's Mayor and Council suspended petitioner from his employment in April 1985, when a Bergen County grand jury indicted him on charges of official misconduct and third-degree theft of a weapon. A jury convicted Corvelli on April 25, 1986. After merging the convictions the trial court sen-

tenced Corvelli to three years probation, 500 hours of community service (later vacated), and ordered payment of $2525 in fines and penalties. Following that conviction Corvelli forfeited his office, as required by *N.J.S.A.* 2C:51–2. The Appellate Division affirmed the convictions in an unreported opinion, and we denied certification, 111 *N.J.* 622, 546 *A.*2d 539 (1988).

In April 1986 Corvelli applied for special retirement from the Police and Fireman's Retirement System under *N.J.S.A.* 43:16A–11.1. When the Board denied the application, Corvelli initiated an administrative appeal of the Board's initial decision. The Administrative Law Judge (ALJ) concluded that Corvelli should forfeit so much of his pension as represented contributions made after June 10, 1982, the date of his criminal conduct. In recommending partial forfeiture, the ALJ relied in part on the detailed account of Corvelli's misconduct in the Appellate Division's opinion affirming the criminal conviction. In that opinion, which had been admitted as a joint exhibit in the record before the ALJ, the Appellate Division described Corvelli as a "martinet" who had become displeased with one of his patrolmen, John Bogovich. Describing the background circumstances at some length, the opinion continues (references in the opinion to "defendant" are to Corvelli):

> The reason for defendant's displeasure is not entirely clear from the record, but it appears to have started when, contrary to defendant's advice, Bogovich testified against the Borough for a fellow police officer. The origin of defendant's displeasure is less important than its effect.
>
> Defendant punished Bogovich by assigning him indefinitely to foot patrol in a park from 2:00 a.m. to 10:00 a.m. That assignment lasted two and a half years until defendant was suspended as a result of charges against him in this action. The assignment not only was physically burdensome but also disrupted Bogovich's family life and deprived him of the opportunity to moonlight, a common practice in the department. The assignment also carried a stigma because no one else in the department, including officers who were given Bogovich's assignments on his days off, was required to patrol the park on foot. Nor was anyone else involuntarily assigned to the same duty every working day. Bogovich did not accept the assignment passively. A chronic complainer by nature, he complained of the assignment to the governing body. He also brought civil actions against defendant, including one in which he demanded $12,000,000 damages. He freely disparaged defendant. Bogovich's protests had no effect, except perhaps to prolong his onerous assignment.

Defendant decided to inflict further punishment on Bogovich by committing the crime of which he was convicted. He is charged with surreptitiously stealing a police shotgun when it was in Bogovich's possession and then falsely accusing Bogovich of carelessness in allowing the gun to be stolen. Defendant enlisted as an accomplice Ronald Weick, a patrolman who was defendant's friend and to whom defendant had shown special favor on the job.

On the night in question, Bogovich was on duty in the park, but on this occasion he had been given a patrol car with which to make his rounds. Officers using that car were issued a shotgun, which they were supposed to keep locked in a rack inside the car. However, the rack rarely was used because it was difficult to close and sometimes popped open when the car struck a bump. Instead, officers stored the gun under the seat. Knowing that Bogovich probably would store the gun under the seat, defendant decided that he would take the gun from the car when Bogovich was on a coffee break.

Defendant telephoned Weick, who was then on desk duty, and told him to report that he was sick so that another officer would take his place at the desk. Defendant then arranged with Weick to pick him up behind the police station. With Weick as a passenger, defendant drove around the Borough in his private station wagon waiting for Bogovich to stop at a coffee shop. After a while Bogovich parked his patrol car near a coffee shop and went in. Defendant parked nearby. While Bogovich was in the shop, Weick, at defendant's direction, entered the locked patrol car with a key that defendant had furnished, removed the shotgun from under the seat, returned to the station wagon and gave the gun to defendant, who later destroyed it. When Bogovich could not find the gun at the end of his tour, he reported it stolen. Defendant suspended him for five days, the maximum sanction available to defendant, for not keeping the shotgun locked in the rack, and recommended to the governing body that it impose a more severe sanction.

Weick, Corvelli's partner in crime, had disclosed the theft of Bogovich's weapon in order to gain a favorable plea in connection with a related offense.

In deciding in favor of partial forfeiture the ALJ applied the eleven-factor balancing test that we created in *Uricoli, supra,* to resolve the problem of "what constitutes dishonorable service justifying the forfeiture of earned pension benefits." 91 *N.J.* at 77, 449 *A.*2d 1267. We there held that the following factors should be considered and balanced:

(1) the employee's length of service; (2) the basis for retirement, *i.e.*, age, service, disability, etc.; (3) the extent to which the employee's pension has vested; (4) the duties of the particular employment; (5) the employee's public employment history and record; (6) the employee's other public employment and service; (7) the nature of the misconduct or crime, including the gravity or substantiality of the offense, whether it was a single or multiple offense and whether it was continuing or isolated; (8) the relationship between the miscon-

duct and the employee's public duties; (9) the quality of moral turpitude or the degree of guilt or culpability, including the employee's motives and reasons, personal gain, and the like; (10) the availability and adequacy of other penal sanctions; and (11) other personal circumstances relating to the employee bearing upon the justness of forfeiture.

[*Id.* at 78, 449 *A.*2d 1267.]

The ALJ found Corvelli entitled to the benefit of all the foregoing factors except numbers seven, eight, and nine—those factors associated with Corvelli's abusive treatment of Bogovich.

Regarding factor seven, "the nature of the misconduct or crime, including the gravity or substantiality of the offense, whether it was a single or multiple offense and whether it was continuing or isolated," the ALJ found Corvelli guilty of "grave and substantial crimes" and of conduct that was "most cruel." Although noting that the offenses might be regarded as continuing, given the fact that Bogovich's patrol assignment had lasted for two-and-a-half years, the ALJ nevertheless concluded that the offenses committed on June 10, 1982, had been "isolated." Considering factor eight, "the relationship between the misconduct and the employee's public duties," the ALJ pointed out Corvelli's concession that his misconduct had been directly related to his public duties and that he had violated the public's trust. Finally, in applying factor nine, "the quality of moral turpitude or the degree of guilt and culpability, including the employee's motives and reasons, personal gain, and the like," the ALJ determined that Corvelli had committed "an act of baseness, vileness, and depravity in his 'private and social duties' to Bogovich, and to society, in general, contrary to the accepted and customary rule of right and duty between man and man."

Despite his harsh characterization of Corvelli's misconduct, the ALJ found that on balance petitioner's long-time, honorable service to the Borough outweighed his misconduct, wherefore he recommended that petitioner be granted a special retirement allowance based on service from September 1, 1955, to June 10, 1982, the date of the criminal offense.

The Board rejected the ALJ's recommended decision. It determined that petitioner's "use of his office to wage a 2½ year vendetta" against Bogovich required that the criminal conduct of June 10, 1982, be treated as "the final act in a continuing series of multiple offenses." The Board viewed the indefinite assignment to foot patrol in the park from 2:00 a.m. to 10:00 a.m. not only as disrupting Bogovich's personal life but also as needlessly exposing him to the risk of his life "in a manner not justified by any concern for the public." Beyond that, according to the Board, when Corvelli engineered the theft of a weapon for which Bogovich was responsible, he further abused his office by directing another police officer to feign illness so that the officer would be free to carry out the theft of the weapon. Finally, and significantly, the Board declared:

> Weighing heavily in our decision is a critical aspect of petitioner's culpability not explicitly addressed by either the trial judge or the ALJ. As Chief of Police, the petitioner owed a duty not only to the public but to those he commanded. Here petitioner involved one of his subordinates in the criminal scheme. It is impossible to either weigh or overstate the harm done to the police force and its members by these acts. This is not an isolated case of ticket fixing as was *Uricoli* but a pattern of behavior over time where the petitioner by his conduct said to those he commanded that abuse of power or office was a permissible course of conduct.

Accordingly, the Board ordered total forfeiture.

The Appellate Division affirmed, concluding that the Board had been "fully justified" in viewing Corvelli's conviction as "merely the culmination of a continuing abuse of power that tended to lower the morale and the behavioral standards" of the members of his department, to diminish the public's respect for the department, and "ultimately to undermine the public's confidence in the rule of law." Said the court: "After petitioner had abused his power for two and a half years in an unsuccessful attempt to provoke Bogovich into committing an infraction for which he could properly be sanctioned, petitioner fabricated an infraction through theft and deceit." Finally, the Appellate Division stated:

> Even if the theft was the sole basis of the criminal conviction, the Board properly viewed petitioner's misconduct as more than that single event. Mis-

conduct may be serious enough to warrant forfeiture of a police officer's pension regardless of whether it results in criminal charges and regardless of the scope of criminal charges that may ensue.

## II

Petitioner contends that the Board's decision was arbitrary and capricious for two reasons: first, the Board altogether misconstrued the meaning of "continuing offense" as used in *Uricoli* factor number seven; and second, the Board arbitrarily concluded that an act against a subordinate police officer was more deserving of punishment than an act more closely touching on a police officer's public duty. As authority supporting the second branch of his argument, Corvelli cites *Uricoli, supra,* 91 *N.J.* 62, 449 *A.*2d 1267; *Eyers v. Board of Trustees,* 91 *N.J.* 51, 449 *A.*2d 1261 (1982); *Widdis v. Public Employees' Retirement System,* 238 *N.J.Super.* 70, 568 *A.*2d 1227 (App. Div.1990); *T.J.M. v. Police & Fireman's Retirement System,* 218 *N.J.Super.* 274, 527 *A.*2d 883 (App.Div.1987). Petitioner asserts that because those cases ordered only partial forfeiture, the total forfeiture in his case is unwarranted.

Concerning petitioner's "continuing offense" argument, we are satisfied that the Board correctly appraised Corvelli's conduct as demonstrating a continuing pattern of behavior over time. That determination makes the *Uricoli* factor number seven apply with particular force.

Every day that Corvelli unnecessarily jeopardized Bogovich's safety by requiring him to patrol the park in the early morning hours represented an independent decision to punish him and amounted to an abuse of Corvelli's office. Each day, Corvelli confronted the decision of whether to continue Bogovich's foot-patrol assignment, and each day he affirmed his decision. Thus, Corvelli engaged in an offense that continued from the time of Bogovich's initial assignment to the time of Corvelli's suspension when he lost the power to assign officers—a period of over two-and-a-half years. The conviction for the merged

charges of official misconduct and weapons theft represented the final act in the continuing series of multiple offenses.

We perceive Corvelli's conduct to be at least as much a continuing offense as those committed by the public officials in *Eyers* and *Widdis*. In *Eyers*, a plumbing inspector was convicted of three counts of unlawfully accepting money in return for concealing plumbing violations and of one count of official misconduct. 91 *N.J.* at 53, 449 *A.*2d 1261. The conviction came after Eyers had begun receiving monthly pension benefits of $442. We reversed the Appellate Division's judgment upholding the Board's determination that Eyers' widow not receive any of her deceased husband's pension benefits. *Id.* at 58, 449 *A.*2d 1261. Applying the *Uricoli* factors, we found that Eyers' misconduct had consisted of a series of offenses that if considered separately were not substantial but that when taken together exposed a pattern of corruption in office deserving at least the partial forfeiture of those benefits acquired subsequent to his acts of misconduct. *Id.* at 55, 449 *A.*2d 1261.

*Widdis* involved a public employee who, while employed as a building inspector, zoning officer, and engineer for various municipalities, had also operated a private practice preparing engineering and surveying documents that ultimately came before him for review. 238 *N.J.Super.* at 71–73, 568 *A.*2d 1227. A grand jury charged Widdis in three indictments with a total of sixty-six counts, including official misconduct, conspiracy, forgery, falsification of records, and knowingly soliciting or agreeing to accept benefits while a public employee. *Id.* at 73–74, 568 *A.*2d 1227. When Widdis pled guilty to only two counts, the others were dismissed. *Id.* at 74, 568 *A.*2d 1227. The Appellate Division upheld the ALJ's decision calling for partial forfeiture.

Corvelli's continuing persecution of Bogovich for two-and-a-half years clearly demonstrates a pattern of abuse of power. Deconstructed, Corvelli's misconduct actually involved approximately 650 individual, daily decisions regarding Bogovich's as-

signment, plus his criminal scheme to steal Bogovich's weapon. We therefore find the Board's decision that Corvelli had engaged in a continuing course of conduct rather than an isolated event entirely consistent with *Eyers* and *Widdis*.

■ Turning to the second branch of petitioner's argument, Corvelli correctly points out that since *Uricoli* neither this Court nor the Appellate Division has upheld a total forfeiture of pension. The cases resulting in partial forfeiture, however, are distinguishable from Corvelli's situation. Hence, the Board's decision ordering total forfeiture was not arbitrary and capricious.

In *T.J.M.*, *supra*, 218 *N.J.Super.* 274, 527 *A*.2d 883, the Appellate Division, applying *Uricoli*, reversed the Board's denial of a police officer's application for retirement benefits. The officer had been convicted of sexually assaulting his teenage daughter. The Appellate Division stated that "only in the most compelling of circumstances should the *Uricoli* test compel a civil servant to forfeit his pension rights when he is convicted of a crime involving moral turpitude which is *unrelated* to his public employment." *Id.* at 279, 527 *A*.2d 883. The court reasoned that the officer's offense was "uniquely personal and completely unrelated to his office." *Id.* at 280, 527 *A*.2d 883. In contrast, Corvelli conceded that his conduct was directly related to his employment: it involved acts done and decisions made in the line of duty. The *T.J.M.* court concluded that the officer's crime was mitigated by the facts that it resulted from a psychological sickness dating back several years to an incestuous relationship he had suffered as a juvenile, rather than from ordinary culpability, and that he had not received any pecuniary or personal gain from the crime. *Id.* at 281, 527 *A*.2d 883. No such factors serve to mitigate Corvelli's culpability. Corvelli's bitter dislike for Bogovich alone caused him to use the power of his office to carry out two-and-a-half years of mistreatment.

In *Eyers, supra,* although we acknowledged that the quality of Eyers' dishonorable conduct militated strongly in favor of forfeiture, we weighed heavily his widow's advanced years, her total dependency on Eyers since the couple's marriage, and the fact that she and Eyers had relied on receiving those payments for the two years prior to Eyers' conviction. 91 *N.J.* at 57, 449 *A.*2d 1261. In so doing, we refused to adopt a strict rule mandating that survivor benefits are directly derivative from, dependent on, and no greater than a pensioner's rights. *Id.* at 56, 449 *A.*2d 1261.

■ We do not read *Eyers* as requiring reversal of an order for total forfeiture whenever survivors have a legitimate claim to pension benefits after the death of the public employee. Rather, we simply count the circumstances of the employee's beneficiaries, their age, their means, and their reliance and dependency on continued receipt of payments as relevant factors to be weighed in the forfeiture decision. In some situations, not present here, that consideration can assume great significance. Moreover, because no payments were ever made, the Corvellis never relied on their continued receipt. Hence, the facts do not call for recognition of the strong public policy favoring a special indulgence for the dependents of public employees who designate a beneficiary.

■ Corvelli relies on *Widdis, supra,* 238 *N.J.Super.* 70, 568 *A.*2d 1227, for his argument that total forfeiture cannot be ordered because *N.J.S.A.* 43:16A–11.1, governing special retirement, does not contain an express forfeiture provision. In *Widdis* the Appellate Division emphasized that "[i]t is for the Legislature to specifically qualify a person's entitlement if it wishes to attempt to strip vested pension rights from a member who has not yet been convicted of any crime." *Id.* at 79, 568 *A.*2d 1227. The court then strictly construed the statute at issue, *N.J.S.A.* 43:15A–38, and found that the exception to vesting of pension rights contemplated actual removal from office, not Widdis's situation in which an employee voluntarily

resigns after allegations of misconduct have been made or charges filed. *Id.* at 79–80, 568 *A.*2d 1227. Before his conviction for official misconduct Widdis had been cloaked with a presumption of innocence and hence there was no reason to invoke the statutory "exception" clause. *Ibid.* However, the Appellate Division ultimately applied *Uricoli* to uphold partial forfeiture, finding that Widdis had sufficient years of prior "honorable service" before the date of his wrongdoing. *Id.* at 83, 568 *A.*2d 1227. Thus, even under the analysis in *Widdis,* service sufficiently dishonorable could have resulted in total forfeiture.

■ Plainly the special retirement statute, *N.J.S.A.* 43:16A–11.1, contains no express forfeiture language. The statute provides in pertinent part:

> Should a member resign after having established 25 years of creditable service, he may elect "special retirement," provided, that such election is communicated by such member to the retirement system by filing a written application, duly attested, stating at what time subsequent to the execution and filing thereof he desires to be retired.

However, the mere absence of forfeiture language does not end the inquiry. The policy requiring forfeiture of pension rights on account of dishonorable service has been part of our law for over half a century. All public pension statutes in this State carry an implicit condition precedent of honorable service to an award of pension benefits, and forfeiture can be ordered for failure of that condition. *Uricoli, supra,* 91 *N.J.* at 66, 449 *A.*2d 1267; *Masse v. Public Employees' Retirement Sys.,* 87 *N.J.* 252, 255–56, 432 *A.*2d 1339 (1981); *Makwinski v. State,* 76 *N.J.* 87, 90, 385 *A.*2d 1227 (1978). In that respect, pension forfeiture operates as a "penalty or punishment for wrongful conduct." *Uricoli, supra,* 91 *N.J.* at 76, 449 *A.*2d 1267; *Masse, supra,* 87 *N.J.* at 262, 432 *A.*2d 1339. As we similarly held in *Masse,* the Legislature must have intended honorable service to be a component of "creditable service" as that term is used in *N.J.S.A.* 43:16A–11.1. Thus, the absence of forfeiture language in the statute under which Corvelli applied does not

foreclose forfeiture of his pension for his failure to serve honorably.

Furthermore, *N.J.S.A.* 43:16A–11.1 is not the only relevant statute. Under *N.J.S.A.* 43:16A–23

> [n]o member who shall have served honorably in any such police or fire department for a period of twenty-five years and attained age fifty-five shall be deprived of his pension privileges under this act because of any violation of the rules and regulations established for the government of such department, but he may be fined, reprimanded or discharged. *A member of this department found guilty before a court of competent jurisdiction may be dismissed or punished in any manner provided by law.* (footnote omitted) (emphasis added).

Because Corvelli was "found guilty before a court of competent jurisdiction" of official misconduct in violation of *N.J.S.A.* 2C:30–2 and of theft of a weapon under *N.J.S.A.* 2C:20–3, he may be dismissed or punished in any manner provided by law. As discussed, pension forfeiture is an acceptable form of punishment under our laws.

◼  We next turn to petitioner's contention that *Uricoli* does not allow his non-criminal conduct to play a role in the denial of a pension. Here again, Corvelli tries to separate the foot-patrol assignment from the weapons-theft scheme. And here again we point out that the criminal conviction concerned only the final act of vindictiveness, the culmination of a continuing course of conduct aimed at punishing, wrongly and in draconian fashion, an officer under Corvelli's supervision. The non-criminal conduct was part and parcel of a long-term evil scheme to get rid of Bogovich. Surely the Board was entitled to base its decision on the whole sorry picture, not just the final piece.

In *Uricoli* we held that a partial forfeiture of pension benefits was in order when the sole blemish on a police officer's otherwise honorable twenty-year service record was a conviction for malfeasance in office resulting from a single incident of ticket fixing for which he had received no remuneration. In so holding we declined to adopt an inflexible rule that would automatically mandate forfeiture on the commission of any misconduct relating to public employment. 91 *N.J.* at 76–77,

449 *A*.2d 1267. Instead, we fashioned a flexible balancing test, one that accommodates equitable considerations. *Id.* at 77, 449 *A*.2d 1267. The *Uricoli* balancing test was our answer in weighing the prevailing view of pensions as deferred compensation, whose purpose is to provide employment stability and financial security, against pension forfeiture, whose purpose is to punish for wrongful conduct.

Although Uricoli had been convicted of a crime, nowhere does our opinion in his case state that only criminal acts may constitute dishonorable service deserving of forfeiture. The term "honorable service" as used in *Uricoli* and other opinions is sufficiently generic to encompass a broad range of misconduct bearing on the forfeiture decision, including but not limited to criminal conviction. Item seven of the *Uricoli* balancing test, by requiring consideration of "the nature of the misconduct *or* crime," 91 *N.J.* at 78, 449 *A*.2d 1267 (emphasis added), anticipates a situation in which non-criminal misconduct in office may result in forfeiture. Likewise, item eight uses the term "misconduct." *Ibid.* Furthermore, item ten's focus on the availability and adequacy of "other penal sanctions" suggests that conduct that does not deserve criminal sanctions may nonetheless deserve the punitive sanction of pension forfeiture. *Ibid.* Finally, item eleven recommends consideration of any "other personal circumstances relating to the employee bearing upon the justness of forfeiture." *Ibid.* That final factor illustrates the broad scope of review that we instructed reviewing bodies to engage in before ordering forfeiture. Thus, the balancing test anticipates a situation in which non-criminal misconduct can factor into a pension-forfeiture decision.

Forfeiture of Corvelli's special retirement pension is consistent with *Uricoli*. In refusing to impose automatic and total forfeiture for job-related employee misconduct in *Uricoli*, we did not foreclose the opportunity for a total forfeiture. Our approach recognized that under the correct circumstances, and after a careful weighing of the eleven factors set forth in that opinion, total forfeiture could be imposed. A total forfeiture of

Corvelli's pension was justified by the evidence as gauged by application of *Uricoli* factors seven, eight, and nine. The Board did not act arbitrarily and capriciously, nor did it violate any legislative policies implied or expressed in the pension-forfeiture statutes at issue.

### III

Given the nature of Corvelli's misconduct and the strength of the evidence demonstrating dishonorable service, we have little difficulty in approving the result below. But the case reminds us that with a different set of facts, the absence of clear standards to guide the various pension boards may pose the risk of *ad hoc* decision-making, productive of uneven results. We therefore strongly recommend that the various boards charged with the responsibility of determining pension entitlement promulgate clear and concise standards governing their decisions on pension forfeiture. Not only will the resulting consistency in outcome better ensure public confidence in the integrity of the system, it will aid appellate review, to the end that we develop a coherent, harmonious body of law.

We do not suggest that the boards produce an exhaustive set of criteria covering every possible contingency. Something akin to the standards found in the *ABA Model Standards for Imposing Lawyer Sanctions* §§ 1.1–9.4 (1992), would suffice. We would anticipate that different boards would develop different standards and would in their decisions rely on those standards and explain how they affected the result in the case under review.

### IV

Judgment affirmed.

*For Affirmance*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI, and STEIN—7.

*Opposed*—None.