**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3167-18T3

LAUREN COOKE,

     Petitioner-Appellant,

v.

BOARD OF TRUSTEES,
TEACHERS' PENSION
AND ANNUITY FUND,

     Respondent-Respondent.

_____

Argued telephonically March 23, 2020 –
Decided April 14, 2020

Before Judges Sumners and Geiger.

On appeal from the Board of Trustees of the Teachers' Pension and Annuity Fund, Department of the Treasury.

Michael Patrick DeRose argued the cause for appellant (Crivelli & Barbati LLC, attorneys; Michael Patrick DeRose, on the brief).

Austin J. Edwards, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Melissa H. Raksa, Assistant

Attorney General, of counsel; Austin J. Edwards, on the brief).

PER CURIAM

Petitioner Lauren Cooke appeals from a February 14, 2019 final decision of respondent Board of Trustees (the Board) of the Teachers' Pension and Annuity Fund (TPAF), imposing a ten percent forfeiture of Cooke's pension benefits pursuant to N.J.S.A. 43:1-3 and N.J.A.C. 17:1-6.1.  We affirm.

I.

Commencing on September 1, 1993, Cooke was employed by the Egg Harbor Township Board of Education (the School Board) as an elementary teacher.  In November 2007, Cooke called another teacher, Jamesella Johnson, "Aunt Jemima" in the presence of other teachers.  In June 2008, Cooke called Johnson a "nigger" in the presence of students and other teachers.  Both statements were made during school hours and on school property.  The School Board contended that Cooke's racial epithets were made in anger and not in jest.

The School Board certified tenure charges with the Commissioner of Education to terminate Cooke from employment and suspended her without pay for 120 days, for violating the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -42.  The School Board alleged Cooke engaged in harassment, intimidation, and bullying in making improper, racially derogatory comments

towards Johnson and lying to an administrator during a resulting investigation in violation of N.J.A.C. 6A:16-7.9(a)(2)(vi),[1] School Board Policy No. 5512.01, and School Board Policy No. 3281. Cooke contested the termination and suspension without pay.

The matter was transferred to the Office of Administrative Law (OAL) as a contested case. On July 22, 2010, an Administrative Law Judge (the Tenure ALJ) issued an Initial Decision finding Cooke had engaged in conduct unbecoming a teacher in violation of School Board Policy No. 3281. The Tenure ALJ found

> that on "Fun Day" in June 2008, when Ms. Cooke was speaking to Jordan Brown, another teacher, in the hallway of the Davenport school during school hours with teachers and school children present, and referred to a third teacher, Jamesella Johnson, as a "nigger" she engaged in conduct unbecoming a teaching staff member.

The Tenure ALJ further found

> that in November 2007, when Ms. Cooke was speaking to Lynne Dixon, another teacher in the teachers' lounge of the Davenport elementary school during school hours with other teachers present, and Ms. Cooke referred to a third teacher, Jamesella Johnson, as "Aunt Jemima," she engaged in conduct unbecoming a teaching staff member. I have reached this conclusion because the term "Aunt Jemima" carries the

---

[1]  Now codified in N.J.A.C. 6A:16-7.7.

3

connotation of servitude or slavery involving cooking services provided by an African-American woman to a Caucasian "master."

The Tenure ALJ determined that removal was not warranted and recommended a 150-day suspension without pay.

On November 22, 2010, the Acting Commissioner of Education adopted the Tenure ALJ's factual findings but modified the penalty to 120 days of salary withholding pursuant to N.J.S.A. 18A:6-14, plus an additional thirty-day suspension without pay, and mandatory training on racial sensitivity at Cooke's own expense. Both parties appealed the Commissioner's decision. Cooke also filed a complaint in the Law Division against the School Board and several other parties seeking relief for alleged discrimination and retaliation under the LAD and the New Jersey Civil Rights Act, N.J.S.A. 10:6-1 to -2.

In February 2012, the tenure appeal and the Law Division action were settled without any "assurance, warranty or guaranty" as to how the Board would decide any application for retirement benefits. The settlement included withdrawal of the tenure decision cross-appeals and the Law Division action. As part of the settlement, Cooke received compensation for administrative leave from January 1 to December 31, 2012.

A-3167-18T3

Cooke then applied for accidental disability retirement benefits but was granted, and ultimately accepted, ordinary disability retirement benefits effective January 1, 2013. On October 7, 2014, the Board informed Cooke that it had recently learned of the tenure charges brought against her. The Board performed an honorable service review, applying and weighing the eleven factors set forth in Uricoli v. Police and Firemen's Retirement System, 91 N.J. 62, 77-78 (1982), later codified in N.J.S.A. 43:1-3(c). The Board imposed a ten percent reduction in her ordinary disability retirement benefits effective January 1, 2013 (allocating five percent to each of the two incidents).

Cooke appealed the Board's decision. The appeal was transferred to the OAL as a contested case. An ALJ (the Forfeiture ALJ) conducted a one-day hearing, without either party calling witnesses, on the following stipulated facts:

1. Cooke has sixteen years and eleven months of membership service in the TPAF.

2. On January 16, 2012, the Division received Cooke's application for an accidental disability retirement.

3. Cooke was vested with over ten years of service on October 1, 2012, her effective date of retirement.

4. Cooke was employed as a teacher.

5. On September 1, 1993, Cooke was enrolled in the TPAF as a result of her employment as a teacher with the Egg Harbor Township Board of Education. During her employment she was suspended without pay from December 1, 2008 through May 1, 2009, and from December 1, 2010 through January 20, 2011. She was placed on paid administrative leave from January 1, 2012 to December 31, 2012, which was the last date pension contributions were remitted on her behalf. She resigned from employment pursuant to the terms of the settlement agreement.

6. Cooke had no other public employment or service.

7. The Egg Harbor Township Board of Education filed tenure charges against petitioner for conduct unbecoming a tenured teacher. On appeal, the Tenure ALJ found that on two occasions, in approximately November 2007 and June 2008, Cooke used racial epithets in reference to another teacher. The Tenure ALJ concluded these incidents constituted unbecoming conduct for a teacher and determined that Cooke violated School Board Policy No. 3281, Inappropriate Staff Conduct. The Commissioner of Education concurred with the conclusion of the Tenure ALJ. Cooke filed an appeal of the tenure matter in the Appellate Division and filed a LAD claim against her employer in the Superior Court, Law

Division. Subsequently, the parties negotiated a settlement and both matters were dismissed. The Board noted that the Commissioner of Education indicated that the charges against petitioner were serious in nature.

8. Cooke's and the Board's appeals were dismissed.

9. As of January 1, 2013, petitioner's total pension benefit was $2,624.58 per month. After the ten percent reduction in the amount of $262.46, her current allowance is $2,362.12 per month.

On November 14, 2018, the Forfeiture ALJ issued an Initial Decision in which she relied upon the Tenure ALJ's factual findings, which were subsequently adopted by the Board. The Forfeiture ALJ found that on both occasions, the racial epithets were made to a staff member other than the target of the inappropriate racist comments, who was not present. No students were present during either incident.

The Forfeiture ALJ noted that the parties stipulated to the seven Uricoli factors. As to factor seven, the Forfeiture ALJ found Cooke was charged misconduct, not criminal behavior. "Neither of the comments were made in the presence of any students." The misconduct involved two incidents that "were isolated events that occurred in private conversations."

As to factor eight, the Forfeiture ALJ noted the Commissioner determined "that the misconduct did not establish [Cooke's] unfitness to discharge the duties and functions of her position as a teacher." Based on that determination, the Forfeiture ALJ concluded factor eight weighed in favor of Cooke because "there is no direct relationship between [Cooke's] misconduct and her public duties as a teacher and the [Board] is collaterally estopped from finding otherwise."

As to factor nine, the Forfeiture ALJ noted "[t]he Acting Commissioner characterized the misconduct as serious in nature" and a "a serious error in judgment." Based on the previously described circumstances of the misconduct, the Forfeiture ALJ concluded that factor nine weighed in favor of Cooke.

As to factor ten, the Forfeiture ALJ noted the Acting Commissioner determined that the loss of 120 days of salary, coupled with a thirty-day suspension without pay, and racial sensitivity training was a sufficient penalty. Therefore, factor ten weighed in favor of Cooke.

Finally, as to factor eleven, the Forfeiture ALJ noted the Acting Commissioner found the mitigating factors included: Cooke had never been previously disciplined; there was no evidence that Cooke treated the students inappropriately; Cooke's comments were not directed at a student; no student

8

overheard her comments; and the comments were made during private conversations. Therefore, factor eleven also weighed in favor of Cooke.

The Forfeiture ALJ concluded that Cooke's "misconduct did not constitute a breach of the condition that public service be honorable." She also concluded that "the ten percent partial forfeiture of [Cooke's] retirement benefits [was] inappropriate and should be reversed." The Attorney General filed exceptions to the Initial Decision.

The Board found the Forfeiture ALJ "failed to appropriately weigh" the Uricoli factors, misapplied the law, and failed "to make conclusions based on the entire record." The Board modified the Initial Decision by making the following additional findings of fact.

The Board noted the Tenure ALJ found as aggravating circumstances that: (1) Cooke's statements were made during school hours; (2) Cooke's reference to another teacher as a "nigger" was made in the presence of children and other teachers; (3) Cooke is a teacher in an elementary school; (4) Cooke's statements were said out of anger and not in a joking manner; and (5) Cooke referred to the same teacher as "Aunt Jemima" on a subsequent occasion.

The Board further noted that the Tenure ALJ found Cooke's testimony was outweighed by the testimony of two credible witnesses having no apparent

motive for being less than truthful. The Tenure ALJ also found that as a public role model, Cooke's actions are judged with more scrutiny than the typical government employee. As an elementary school teacher, Cooke was arguably required to exercise even greater self-restraint. "[H]er failure to act appropriately ha[d] recklessly put young children at risk, ha[d] created unnecessary tension among the teachers and ha[d] cast doubt as to her fitness to teach impressionable children." The Tenure ALJ further found the utterance of racial slurs was unbecoming conduct regardless of whether children were present. Finally, the Tenure ALJ found that Cooke's reference to the same teacher as "Aunt Jemima" showed a pattern of behavior rather than an isolated incident.

As to Uricoli factors, the Board found factors one through seven weighed in favor of a partial forfeiture. Regarding factor seven (nature of misconduct or crime), the Board noted that its "powers to determine a pension forfeiture are not limited to criminal misconduct," citing Corvelli v. Board of Trustees, Police & Firemen's Retirement System, 130 N.J. 539, 552 (1992).

As to factor eight (relationship between misconduct and public duties), the Board rejected the Forfeiture ALJ's application of collateral estoppel to the finding in the tenure proceeding that Cooke's "misconduct did not establish [her]

unfitness to discharge the duties and functions of her position as a teacher." Relying on <u>Winters v. North Hudson Regional Fire & Rescue</u>, 212 N.J. 67, 85 (2012), the Board concluded it was not collaterally estopped because it was not a party to the tenure proceeding. It deemed Cooke collaterally estopped from disputing the finding that she called Johnson racial epithets on two identifiable occasions because she was a party to the tenure proceeding.

The Board rejected "the Forfeiture ALJ's conflation of the standards in disciplinary matters and pension forfeiture matters." While the tenure decision properly considered progressive discipline in determining whether the record supported removal, it did not analyze whether the misconduct had a direct relationship to her teaching duties. The Board found "the Forfeiture ALJ erred in not making an independent analysis of these facts under <u>Uricoli</u>." The Board concluded that factor eight weighed in favor of partial forfeiture.

As to factor nine (quality of moral turpitude), the Board noted that "the Forfeiture ALJ acknowledged that the Tenure Decision described Cooke's conduct as serious in nature and as a serious error in judgment, but failed to give sufficient weight to the sustained charges of conduct unbecoming." The Board concluded the Forfeiture ALJ failed to recognize how Cooke's misconduct

11

related to her duties as a teacher and rose to the level of moral turpitude. The Board found factor nine weighed in favor of partial forfeiture.

As to factor ten (availability and adequacy of other penal sanctions), the Board rejected "the Forfeiture ALJ's summary conclusions." It found that even though factor ten weighed more heavily in Cooke's favor, factors seven, eight, and nine should be given greater weight in the Board's decision, citing Corvelli, 130 N.J. at 553.

Finally, as to factor eleven (other personal circumstances bearing upon justness of forfeiture), the Board rejected "the Forfeiture ALJ's failure to balance mitigating factors against the aggravating circumstances found by the Tenure ALJ." Because she found the personal circumstances asserted by Cooke unavailing, factor eleven weighed in favor of partial forfeiture.

The Board concluded that Cooke's dishonorable conduct warranted partial forfeiture. It modified the Forfeiture ALJ's findings of fact, modified and rejected her conclusions of law, and affirmed the ten percent forfeiture of Cooke's pension. This appeal followed.

In this appeal, Cooke raises the following points: (1) the Board's rejection of the Forfeiture ALJ's Initial Decision and affirmance of the ten percent partial pension forfeiture was arbitrary, capricious, and inconsistent with governing

12

law; (2) the Board failed to afford due consideration of Uricoli factor ten, regarding the adequacy of other penal sanctions, and factor eleven, pertaining to other personal circumstances bearing upon the justness of forfeiture; and (3) alternatively, it was error for the Board to apply collateral estoppel in light of the underlying procedural history.

## II.

### A.

Our review of a final decision of an administrative agency is limited. Russo v. Bd. of Trs., Police & Firemen's Ret. Sys., 206 N.J. 14, 27 (2011) (citing In re Herrmann, 192 N.J. 19, 27 (2007)).  The agency's decision should be upheld "unless there is a clear showing that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record."  Ibid. (quoting Herrmann, 192 N.J. at 27-28).  "The burden of demonstrating that the agency's action was arbitrary, capricious or unreasonable rests upon the [party] challenging the administrative action."  In re Arenas, 385 N.J. Super. 440, 443-44 (App. Div. 2006) (citations omitted).

"We recognize that agencies have 'expertise and superior knowledge . . . in their specialized fields.'"  Hemsey v. Bd. of Trs., Police & Firemen's Ret. Sys., 198 N.J. 215, 223 (2009) (alteration in original) (quoting In re License

Issued to Zahl, 186 N.J. 341, 353 (2006)). We therefore accord deference to the "agency's interpretation of a statute" it is charged with enforcing. Thompson v. Bd. of Trs., Teachers' Pension & Annuity Fund, 449 N.J. Super. 478, 483 (App. Div. 2017) (quoting Richardson v. Bd. of Trs., Police & Firemen's Ret. Sys., 192 N.J. 189, 196 (2007)), aff'd o.b., 233 N.J. 232 (2018). "'Such deference has been specifically extended to state agencies that administer pension statutes,' because 'a state agency brings experience and specialized knowledge to its task of administering and regulating a legislative enactment within its field of expertise.'" Id. at 483-84 (quoting Piatt v. Police & Firemen's Ret. Sys., 443 N.J. Super. 80, 99 (App. Div. 2015)).

"A reviewing court 'may not substitute its own judgment for the agency's, even though the court might have reached a different result.'" In re Stallworth, 208 N.J. 182, 194 (2011) (quoting In re Carter, 191 N.J. 474, 483 (2007)). "This is particularly true when the issue under review is directed to the agency's special 'expertise and superior knowledge of a particular field.'" Id. at 195 (quoting Herrmann, 192 N.J. at 28).

That said, when the facts are undisputed, determinations involving statutory interpretation are reviewed de novo. Bowser v. Bd. of Trs., Police & Firemen's Ret. Sys., 455 N.J. Super. 165, 170-71 (App. Div. 2018). Conversely,

when controlling facts are disputed, we afford deference to the Board's factual findings. Oceanside Charter Sch. v. Dep't of Educ., 418 N.J. Super. 1, 9 (App. Div. 2010).

B.

A public employee must provide "honorable service" to receive pension or retirement benefits. N.J.S.A. 43:1-3(a) ("The receipt of a public pension or retirement benefit is . . . expressly conditioned upon the rendering of honorable service by a public officer or employee."); N.J.A.C. 17:1-6.1(a); see also Corvelli, 130 N.J. at 550 (noting all of New Jersey's public pension statutes have an implied requirement of honorable service, and forfeiture can be ordered for employees who violate that requirement). The Board is authorized to order forfeiture, in whole or in part, "for misconduct occurring during the member's public service which renders the member's service or part thereof dishonorable." N.J.S.A. 43:1-3(b); see also N.J.A.C. 17:1-6.1(a), (c).

The forfeiture of a public employee's pension is governed by the eleven factors enumerated in Uricoli, 91 N.J. at 77-78, and subsequently codified in N.J.S.A. 43:1-3(c):

> (1) the member's length of service; (2) the basis for retirement; (3) the extent to which the member's pension has vested; (4) the duties of the particular member; (5) the member's public employment history

and record covered under the retirement system; (6) any other public employment or service; (7) the nature of the misconduct or crime, including the gravity or substantiality of the offense, whether it was a single or multiple offense and whether it was continuing or isolated; (8) the relationship between the misconduct and the member's public duties; (9) the quality of moral turpitude or the degree of guilt or culpability, including the member's motives and reasons, personal gain and similar considerations; (10) the availability and adequacy of other penal sanctions; and (11) other personal circumstances relating to the member which bear upon the justness of forfeiture.

[N.J.S.A. 43:1-3(c).]

The factors "must be balanced and then weighed in terms of the goals to be achieved under the pension laws." Uricoli, 91 N.J. at 78. The test "accommodates equitable considerations." Corvelli, 130 N.J. at 552. The Board may, however, attribute more weight to factors seven, eight, and nine, when applicable. Id. at 552-53.

Forfeiture may be total or partial; partial forfeiture is generally "calculated as if the accrual of pension rights terminated as of the date the misconduct first occurred." N.J.S.A. 43:1-3(d); see also Uricoli, 91 N.J. at 79. If the resulting forfeiture is excessive, the forfeiture should be modified to "reflect[] the nature and extent of the misconduct and the years of honorable service." N.J.S.A. 43:1-3(d).

C.

With those principles in mind, we consider whether the Board's decision was arbitrary, capricious, unreasonable, or unsupported by substantial credible evidence in the record.

We first note that an ALJ's factual findings of lay-witness credibility generally receive deference. See N.J.S.A. 52:14B-10(c) ("The [Board] may not reject or modify any findings of fact as to issues of credibility of lay witness testimony unless . . . the findings are arbitrary, capricious or unreasonable or are not supported by sufficient, competent, and credible evidence in the record."). In considering that evidence, "the reviewing court should give 'due regard to the opportunity of the one who heard the witnesses to judge of their credibility.'" Clowes v. Terminix Int'l, Inc., 109 N.J. 575, 587 (1988) (quoting Close v. Kordulak Bros., 44 N.J. 589, 599 (1965)). "[I]t is not for us or the agency head to disturb that credibility determination, made after due consideration of the witnesses' testimony and demeanor during the hearing." H.K. v. Dep't Human Servs., 184 N.J. 367, 384 (2005). Here, the Tenure ALJ found Cooke's testimony was outweighed by the testimony of two credible witnesses having no apparent motive to lie.

A-3167-18T3

Their testimony demonstrated that Cooke's misconduct occurred on school property during school hours. It involved two separate incidents of using racial epithets to disparage a fellow teacher. One statement was made in the presence of teachers; the other was made in the presence of teachers and students. The epithets were stated in anger, not jest. The misconduct involved a repeated pattern of behavior rather than an isolated incident. Cooke's repeated misconduct was related to her position.

The Board contends that the Forfeiture ALJ erred in applying collateral estoppel against it rather than Cooke. We agree. In order to apply collateral estoppel, the party against whom the doctrine is asserted must have been a party to the earlier proceeding and "the issue to be precluded [must be] identical to the issue decided in the prior proceeding." Winters, 212 N.J. at 85 (quoting Olivieri v. Y.M.F. Carpet, Inc., 186 N.J. 511, 521 (2006)). Here, neither of those elements are met. The Board was not a party to the tenure proceedings. The tenure proceeding involved a different issue (removal or discipline short of removal) than the pension proceeding (forfeiture of pension benefits). Consequently, it was error to apply collateral estoppel against the Board.

The result is, of course, different as to Cooke. Cooke was a party to the tenure proceeding. The misconduct involved was identical in both proceedings;

18

the issue was actually litigated in the tenure proceeding; the issue was decided on the merits in the tenure proceeding; the determination of the issue was essential to the decision in the tenure proceeding; and Cooke was a party in the tenure proceeding. See ibid. (quoting Olivieri, 186 N.J. at 521). Moreover, Cooke has not demonstrated that the settlement agreement was intended "to operate to vacate" the tenure decision since the settlement agreement contained no such language. Perez v. Rent-A-Center, Inc., 186 N.J. 188, 201 (2006). Consequently, the Board properly applied collateral estoppel against Cooke as to the factual findings of the Tenure ALJ. See Winters, 212 N.J. at 73 (reaffirming that "estoppel principles can apply to findings made in administrative proceedings and affect subsequent judicial proceedings").

Given our deferential standard of review and the serious nature of Cooke's repeated misconduct, we discern no basis to overturn the Board's final decision to impose a ten percent forfeiture of Cooke's pension benefits. The Board's findings are supported by substantial evidence in the record. The Board carefully applied and weighed the Uricoli factors, thus, its decision is neither arbitrary, capricious, nor unreasonable. Lastly, the partial forfeiture is not "so disproportionate to the offense, in light of all the circumstances, as to be shocking to one's sense of fairness." Matter of Hendrickson, 235 N.J. 145, 159

(2018) (quoting <u>Herrmann</u>, 192 N.J. at 28-29). On the contrary, the Board limited the forfeiture so that it was not excessive, even if hypothetically a more severe sanction might have been imposed.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION