DOMINICK A. SPINA, JOSEPH HENSEL, Jr., EDWARD CARR, FRANK ADUBATO, JOSEPH MULHEARN, THOMAS E. KELLY, ANDREW KIRKPATRICK, JOSEPH FRUCHTER, ALBERT A. WELLER, LAWRENCE W. SHERIDAN, "RESTORATION OF THE 1920 PENSION ACTS RIGHTS COMMITTEE," AN UNINCORPORATED ORGANIZATION OR ASSOCIATION CONSISTING OF SEVEN OR MORE PERSONS, INDIVIDUALLY AND ON BEHALF OF A CLASS CONSISTING OF OTHERS SIMILARLY SITUATE TOO NUMEROUS TO BE NAMED, PLAINTIFFS-APPELLANTS, v. CONSOLIDATED POLICE AND FIREMEN'S PENSION FUND COMMISSION, A COMMISSION OF THE STATE OF NEW JERSEY ESTABLISHED IN THE DIVISION OF INVESTMENTS IN THE DEPARTMENT OF THE TREASURY, THE CITY OF JERSEY CITY, A MUNICIPAL CORPORATION AND THE CITY OF NEWARK, A MUNICIPAL CORPORATION, DEFENDANTS-RESPONDENTS.

Argued October 21, 1963—Decided January 20, 1964.

Mr. *Maurice C. Brigadier* argued the cause for appellants (*Mr. Seymour Margulies,* associate counsel and on the brief).

Mr. *Steven S. Radin,* Deputy Attorney General, argued the cause for respondent Consolidated Police and Firemen's Pension Fund (*Mr. Arthur J. Sills,* Attorney General of New Jersey, attorney).

Mr. *Meyer Pesin,* for respondent City of Jersey City (*Mr. Joseph S. E. Verga,* of counsel), and Mr. *Norman N. Schiff,* for respondent City of Newark (*Mr. Joseph A. Ward,* of counsel), submitted a brief on behalf of respondents City of Jersey City and City of Newark.

The opinion of the court was delivered by

WEINTRAUB, C. J. Plaintiffs seek a judgment that they and other members of certain police and firemen's pension plans are entitled to retire at age 50 after 20 years of service under the terms of *Chapter* 160 of the *Laws of* 1920. That statute had originally so provided, but amendatory legislation now requires 25 years of service and a minimum age of 51. *N. J. S. A.* 43:16–1.

Plaintiffs were appointed policemen or firemen between 1940 and 1944. As we understand the situation, membership in their pension funds was closed by *Chapter* 255 of *Laws of* 1944, *N. J. S. A.* 43:16A–1 *et seq.,* which required policemen and firemen thereafter appointed to participate in a new retirement plan created by that chapter.

The complaint is that the amendatory legislation enlarging the requirements for retirement under the 1920 statute is constitutionally void as an impairment of a contract or a taking of property without due process. On cross motions for summary judgment the trial judge found that precedents in our State firmly rejected the assault and hence ordered judgment for defendants. We certified the appeal before it was heard in the Appellate Division.

## I.

The legal issues must be viewed realistically against the story of these pension plans. The story appears in the Report of the New Jersey Advisory Commission on Local Police and Firemen's Pension Funds dated February 1, 1952, and much of it was recounted in *City of Passaic v. Consolidated Police & Firemen's Pension Fund Comm'n,* 18 *N. J.* 137 (1955).

Between 1887 and 1917, 26 laws were passed relating to retirement of policemen and firemen. By 1918 there were 55 funds covering 3,000 of a total of 3,700 policemen and 2,150 of 2,300 paid firemen. The plans varied, with service requirements ranging from 20 to 25 years and retirement age from 50 to 60. Benefits too were not uniform. The members con-

tributed to some funds but not to others. Member contributions, where required, were from 1% to 2% of salary, while municipalities contributed from 1% to 4% of salaries. In addition there were miscellaneous revenues from certain tax sources and even from social events sponsored by the funds.

All of these funds had in common the promise of inevitable doom. The reason was that the annual revenues were not related to the ultimate cost of pension benefits, so that while current income might suffice for the earlier pensioners, the day had to come when little or nothing would remain for others, even of their own contributions to the fund. Accordingly there were periodic crises, in connection with which long-range solutions were offered, only to be rejected in favor of something more palatable for the moment.

In fact the 1920 act to which plaintiffs would recur was itself a "solution" that merely delayed a true one. On January 31, 1918 the Pension and Retirement Fund Commission submitted its report to the Legislature. It estimated that to be solvent, a typical police pension fund should start with an annual contribution of 17.13% of salary which would gradually decrease to a normal contribution of 8.34% in the course of 60 years, whereas in fact nearly three-fourths of those funds started with total annual revenues of less than 5% and in nearly half the funds the revenues were 2% or less. The report noted that legislation had already been sought and obtained to permit municipalities to appropriate additional moneys to meet deficits, and that as to a number of the larger funds the annual outlay, already at 10% of payroll, eventually would reach 20% to 25% because of the absence of reserves.

The Commission recommended stern measures, but instead *Chapter* 160 of the *Laws of* 1920 was enacted. It constituted a uniform retirement law to which existing and subsequent funds had to conform. It provided benefits more liberal than under a majority of the existing local funds whereas the Commission had recommended raising age and service requirements. The statute made little change in the contribu-

tions required of members and municipalities whereas the Commission proposed the rates be increased to provide for the benefits on an actuarial reserve basis. *Chapter* 160 also contained in *section* 4 the following provision upon which plaintiffs lay great emphasis and to which we will later refer:

"* * * In case there shall not be sufficient money in said pension fund created as aforesaid, the common council or other governing body shall include in any tax levy a sum sufficient to meet the requirements of said fund for the time being."

In 1930 the Legislature constituted a Pension Survey Commission. In its report (1932) the Commission found that in 1931 there were 108 local funds operating under the 1920 law and covering 11,153 out of 15,417 active paid police and fire personnel. At that time there were 2,116 pensioners, with an annual pension roll already in excess of the total annual contributions to the funds. The Commission found that the contributions to the funds averaged 7.17% of the members' salary of which the members supplied 2.17% of salary, whereas the annual contributions needed to support the benefits for a new employee were an average of 15.67% of salary. In dollars, the funds had assets of but $3,269,000 and a deficit of $99,500,000, the latter being the amount which, if added at once and invested at 5% interest, would permit liquidation of future pension obligations. The Commission's remedial recommendations were not enacted.

The 1952 report refers to a study in 1940 by the State Chamber of Commerce. That study showed that by 1940 the municipal deficiency appropriations already exceeded the fixed municipal contributions required by law, and the two represented a total municipal contribution of 9.6% of payroll. The study estimated "conservatively" that in the ensuing 35 years the 190 municipalities having these funds would pay $250,-000,000 in deficiency appropriations alone.

Such was the situation when these plaintiffs became members of the funds. In 1940 annual deficiency appropriations to seven of the larger funds reached $1,167,000, and by 1944

the figure climbed to $1,729,000, with more than one million of that sum contributed in Newark and Jersey City, the two municipalities joined as defendants in this action. The situation was so grave that in 1944 representatives of employee groups, taxpayer groups, municipal officials, and State officials joined in search of an answer. There emerged a compromise (*L.* 1944, *c.* 254), a major step toward improvement but still short of a solution. The highlights were these. Active (uniformed) personnel could retire at age 53 (other personnel at age 60) after 25 years of service. The pension was based on average salary of the member during his last five years of service. The members and the municipality were each required to contribute 5% of salary. The State agreed to contribute $1,000,000 annually. No new pension funds could be established under *Chapter* 160, *Laws of* 1920; instead a state-wide actuarially sound Police and Firemen's Retirement System was created by *L.* 1944, *c.* 255, covering all new employees.

As thus revised, these funds were still fiscally unsound. Further, some of the gains of the 1944 compromise were lost when amendments were made in 1947 (*c.* 234) and 1948 (*c.* 449), lowering the retirement age of uniformed members to 51 and increasing certain benefits.

In 1950 the State Department of Banking and Insurance issued a report on the 1920 funds. It was found that as of July 1, 1949 the funds, numbering some 200, had a combined deficit of $209,110,636, being the sum which, if immediately added, would, with earnings at 3%, permit fulfillment of the funds' obligations. As to Newark and Jersey City, the report revealed their funds respectively had assets of $95,089 and $137,283 with deficits of $40,383,290 and $31,487,523.

This brings us to *Chapter* 358 of the *Laws of* 1952 which was a response to the 1952 report. The statement annexed to the bill referred to the "combined unfunded deficit of over $209,000,000.00," noted the "very serious concern to municipal officials and taxpayers, as well as the police and firemen," and stated the purpose to fund the deficits through a 30-year

annual amortization program. To that end the statute consolidated all of the 1920 pension funds. It continued the 5% rate of contribution on the part of both members and municipalities, and required municipalities to contribute annually for the ensuing 30 years sums equal to two-thirds of the amount needed to achieve actuarial solvency at the end of that period, the remaining one-third to be contributed by the State. This act withstood sundry attacks by a municipality in *City of Passaic v. Consolidated Police & Firemen's Pension Fund Comm'n, supra,* 18 *N. J.* 137.

As we have said, plaintiffs seek the right to retire at age 50 upon 20 years of service as the 1920 act originally provided. It is clear from the foregoing review that it was the 1944 amendment that invaded that alleged right since it raised the required period of service to 25 years and the retirement age to 53, which age was later reduced to 51 and so remains today. Thus plaintiffs permitted some 18 years to pass during which the municipalities and the State contributed millions of dollars for the pensions of men already retired and for the eventual retirement of plaintiffs themselves.

Defendants understandably urge the complaint comes too late, for there is no way to unscramble the many things that make up the present product. The moneys contributed by the State could not be recaptured, and if plaintiffs should be correct in claiming the municipalities were constitutionally bound to tap the taxpayer for the deficit, there could not be restored to the public the opportunity which might have been its if that proposition had been seasonably established, to forego other services, to lower or contain salaries, or to reduce or limit the forces. Not only did plaintiffs omit to sue, but in fact they contributed at rates in excess of those in being when they became members of their respective plans, thus indicating in an affirmative way that they accepted or at least yielded to the Legislature's claim of power to revise the plans. Nonetheless we will accept the issue plaintiffs ask us to decide, *i. e.,* whether the amendments violated a constitutional right.

## II.

 This case is a rerun of *Emanual v. Sproat,* 136 *N. J. L.* 154 (*Sup. Ct.* 1947), affirmed o. b. 137 *N. J. L.* 610 (*E. & A.* 1948). There, too, a policeman sought retirement at age 50 after 20 years of service and assailed the 1944 act which, as we noted above, had enlarged the requirements of the 1920 law. In rejecting the claim the court said "It is settled beyond question that the prosecutor had no contractual or vested right under the Pension Act of 1920" (136 *N. J. L.,* at *p.* 156). Our cases have uniformly held that the Legislature may revise[1] pension plans which governmental employees are required[2] to join. *Laden v. Daly,* 132 *N. J. L.* 440 (*Sup. Ct.* 1945), affirmed o. b. 133 *N. J. L.* 314 (*E. & A.* 1945); *Bader v. Crone,* 116 *N. J. L.* 329 (*Sup. Ct.* 1936); *Bennett v. Lee,* 104 *N. J. L.* 453 (*Sup. Ct.* 1928); *Barnett v. Pension Comm'n, &c.,* 100 *N. J. Eq.* 473 (*Ch.* 1927). The weight of authority elsewhere so holds. Annot., 52 *A. L. R.* 2*d* 437 (1957).

---

[1] Upon the premise that a member of the fund acquired no fixed right, it was held that after he was dismissed for dishonorable conduct, he could not claim retirement benefits upon the theory that he acquired a right to them prior to dismissal because he had already served the required period and reached the required age. *Plunkett v. Board of Pension Comm'rs,* 113 *N. J. L.* 230 (*Sup. Ct.* 1934), affirmed o. b. 114 *N. J. L.* 273 (*E. & A.* 1935); *Walter v. Police & Fire Pension Comm'n,* 120 *N. J. L.* 39 (*Sup. Ct.* 1938); *cf. McFeely v. Board of Pension Comm'rs,* 1 *N. J.* 212 (1948), and *Connelly v. Municipal Employees' Pension Comm'n,* 130 *N. J. L.* 101 (*Sup. Ct.* 1943). And in *Salley v. Firemen's & Policemen's Pension Fund Comm'n,* 124 *N. J. L.* 79 (*Sup. Ct.* 1940), it was held the Legislature could provide that pension benefits shall not be paid during imprisonment of the pensioner even though the retirement occurred before the statute was enacted.

[2] Our cases speak of "compulsory" deductions in stating the rule. The reason is that in *Pennie v. Reis,* 132 *U. S.* 464, 10 *S. Ct.* 149, 33 *L. Ed.* 426, 430 (1889), in which it was held that a pension fund was entirely at the disposal of the State until the right to receive a pension actually accrued, the Court said if the contributions were voluntarily made from pay which had reached the employee's hands, then "a different question would have been raised with respect to the dis-

Plaintiffs say the 1920 statute created "a guaranteed fund" and on that account the plan should be deemed to be contractual notwithstanding the cited precedents. The expression "guaranteed fund" is the litigants' characterization; no such phrasing will be found in the act. What plaintiffs refer to is the mandate in *section* 4 quoted above and here repeated for convenience:

"* * * In case there shall not be sufficient money in said pension fund created as aforesaid, the common council or other governing body shall include in any tax levy a sum sufficient to meet the requirements of said fund for the time being."

We cannot find in this provision a decision by the Legislature to part with its power of revision by thrusting a "contractual" obligation upon municipalities.

As we noted above, the 1952 statute provides for payment by the State of one-third of the deficit over a period of 30 years. In *City of Passaic v. Consolidated Police & Firemen's Pension Fund Comm'n, supra,* 18 *N. J.,* at *p.* 147, it was urged that the State thereby created a debt in violation of *Art.* VIII, § II, *par.* 3 of our Constitution. We answered that "No debt has been created here, but rather present legislation merely provides that the State shall annually contribute to the fund." So here, the provision quoted above was simply an expression of legislative policy which remained within the control of that and every subsequent Legislature.

---

position of the fund, or at least of the amount of the decedent's contribution to it." That reservation was noted in *Pension Comm'n, &c. v. Atlantic City Fire Dep't Pension Fund,* 98 *N. J. L.* 794, 795 (*E. & A.* 1923), and *Barnett v. Pension Comm'n, &c.,* 100 *N. J. Eq.* 473 (*Ch.* 1927). We apparently have no decision in this State dealing with the area thus reserved. We note that *Ball v. Board of Trustees of the Teachers' Retirement Fund,* 71 *N. J. L.* 64 (*Sup. Ct.* 1904), is not such a case. There the pension plan was a voluntary arrangement among the teachers, to which government was not a party or a contributor. On those facts, the court held the members had contractual rights with respect to their own fund which the Legislature could not alter.

██ This is in harmony with the general approach in our State that the terms and conditions of public service in office or employment rest in legislative policy rather than contractual obligation, and hence may be changed except of course insofar as the State Constitution specifically provides otherwise. *Laba v. Board of Education,* 23 *N. J.* 364, 391 (1957) ; *Phelps v. State Board of Education,* 115 *N. J. L.* 310, 314 (*Sup. Ct.* 1935), affirmed o. b. 116 *N. J. L.* 412 (*E. & A.* 1936), affirmed 300 *U. S.* 319, 57 *S. Ct.* 483, 81 *L. Ed.* 674 (1937) ; *Greenway v. Board of Education,* 129 *N. J. L.* 46 (*Sup. Ct.* 1942), affirmed 129 *N. J. L.* 461 (*E. & A.* 1943) ; *Hillel v. Borough of Edgewater,* 106 *N. J. L.* 481, 482 (*E. & A.* 1930) ; *Turner v. Passaic Pension Comm'rs,* 112 *N. J. L.* 476, 480 (*Sup. Ct.* 1932).

*Dodge v. Board of Education,* 302 *U. S.* 74, 58 *S. Ct.* 98, 82 *L. Ed.* 57 (1937), sustained a state law reducing an annuity payable upon retirement. The Court said that to decide whether a statute tenders a contract or merely declares a state policy, it is of first importance to examine the language of the statute. If the statute expressly calls for the execution of a written contract or confirms a settlement of a dispute, a contract can be found. But:

"* * * On the other hand, an act merely fixing salaries of officers creates no contract in their favor and the compensation named may be altered at the will of the legislature. This is true also of an act fixing the term or tenure of a public officer or an employe of a state agency. The presumption is that such a law is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise. He who asserts the creation of a contract with the state in such a case has the burden of overcoming the presumption." (302 *U. S.,* at *p.* 78, 58 *S. Ct.,* at *p.* 100, 82 *L. Ed.,* at *p.* 62)

Thus measured, the 1920 statute did not result in a contract. Not a word smacks of an intent to require or to permit one. Indeed efforts to introduce a contractual gloss in this area have failed.[3]

---

[3] In 1947, Senate Bill No. 94 would have amended the very statute before us to provide that the obligation to meet the deficiency by

Plaintiffs say the abundant case law rejecting their position emerged from the erroneous concept that pension benefits are a mere "gratuity," whereas today their compensatory quality is more plainly in view. If these benefits are compensation, then, the argument goes, it should follow that there is an immutable right to them.

We think there is no profit in dealing in labels such as "gratuity," "compensation," "contract," and "vested rights." None fits precisely, and it would be a mistake to choose one and be driven by that choice to some inevitable consequence.

Government's contribution to a pension fund has several facets. In part it compensates for services already rendered. It is also a reward for services to be rendered over the required minimum number of years, but the employee has no right to be continued in employment for enough years to earn it. In both respects the contribution seems compensatory, at least as of the time of eligibility for retirement. Yet it can be viewed also as noncompensatory payment to further the public employer's own interests, i. e., to permit the employer

---

taxation is "established and constituted as a contractual obligation between the members of, and the pensioners under, such fund and such municipality or county." This language, however, was deleted in the committee substitute and instead the taxing provision was declared to be "an obligation of such municipality or county." The bill as adopted so provided, *L.* 1947, *c.* 234, § 4, and the statute continued so to provide until the amendment of 1952. In the same year, 1947, a proposal was made at the Constitutional Convention that retirement benefits be contractual, to be neither diminished nor impaired. The proposal was rejected. III *Constitutional Convention of* 1947, *pp.* 103–106. And finally we note that in 1955 *Assembly Bill No.* 515, relating to another pension plan, provided that "membership of any person in the retirement system shall constitute a contractual relationship with the county." The Governor vetoed the bill, saying "The quoted language attempts to impose upon the county, without its consent, a contractual obligation which might incorporate a right to receive from the county all of the anticipated benefits of active members and preclude any alterations with respect to the plan, either as to benefits or contributions, which changing economic circumstances might make imperative. If this should be the true import of the quoted sentence, the consequences could be far-reaching." *Veto Messages* (1955), *p.* 125.

to release an aged servant who cannot decently be let out if he is unable to meet the necessities of life. Indeed, public pension plans are strongly urged on that account, and to that end public employees are usually required to be members.

As to the employee's contribution, it seems to be a sum already earned. Yet it is earned with a string, for it must go into the fund and in fact is deducted from the ostensible total pay. Moreover, the Legislature need not provide that the contribution must be returned upon cessation of employment; it may direct that it be retained for the common benefit of all. Pension plans go both ways, see *Feher's Estate v. Board of Trustees*, 68 *N. J. Super.* 391 (*App. Div.* 1961); *McFeely v. Pension Comm'n*, 8 *N. J. Super.* 575 (*Law Div.* 1950), and neither approach can be said to be palpably unfair. Thus the employee's contribution, even though taken from his pay, is something he never had in hand and could not insist upon receiving.

██ In these circumstances, it seems idle to sum up either the public's or the employee's contribution in one crisp word. We have no doubt that pension benefits are not a gratuity within the constitutional ban against the donation of public moneys. *Hayes v. City of Hoboken*, 93 *N. J. L.* 432 (*E. & A.* 1919). And we think the employee has a property interest in an existing fund which the State could not simply confiscate. Whether the interest thus secured from arbitrary action is limited to the employee's own contribution or extends to the entire fund and whether it becomes still more secure upon retirement, we need not say. The question is too academic to be pursued, for our Legislature would not think of making off with a fund. The usual situation, as in the case before us, is a fund that cannot meet all of the present and future demands upon it. And the question is whether the Legislature is free to rewrite the formula for the good of all who have contributed.

In a minority of the jurisdictions the rights of a member are called "contractual." Several state constitutions use that terminology, but ours does not, and hence we are primarily

interested in judicial decisions which so characterize the pension program in the absence of constitutional prescription.

It appears in some cases, notably in California, Georgia, and Washington, that the contract thesis was thought to be required lest the pension benefits fall within the constitutional ban again gifts of public moneys. *Kern v. City of Long Beach,* 29 *Cal.* 2d 848, 179 *P.* 2d 799, 801 (*Sup. Ct.* 1947); *Bender v. Anglin,* 207 *Ga.* 108, 60 *S. E.* 2d 756, 760 (*Sup. Ct.* 1950); *Bakenhus v. City of Seattle,* 48 *Wash.* 2d 695, 296 *P.* 2d 536, 538 (*Sup. Ct.* 1956). We think there is no need to choose between such stark alternatives. A payment is not a gift because it rests only upon legislative policy. It does not offend the Constitution to pay for services merely because the arrangement remains subject to legislative revision or rescission. Government may satisfy even a moral obligation. Indeed, the parent case for the view that pension benefits rest upon legislative will did not call them a "gift," but rather an "expectancy, created by law, and liable to be revoked or destroyed by the same authority." *Pennie v. Reis,* 132 *U. S.* 464, 10 *S. Ct.* 149, 151, 33 *L. Ed.* 426, 429 (1889).

The difficulty with the contract approach is that it cannot withstand the pressures upon it.

If the contractual obligation of the public employer is really to equal the expectations of all of the rank-and-file members, it must include a guaranty by the employer of the solvency of the fund. Yet, except perhaps for the Georgia case cited above, we have found no case that goes that far. California, which is the leading exponent of the contract thesis, holds the Legislature may revise a plan "to maintain the integrity of the system," which, if we correctly read the opinions, means that the public employer does not guarantee the solvency of the plan. *Allen v. City of Long Beach,* 45 *Cal.* 2d 128, 287 *P.* 2d 765, 767 (*Sup. Ct.* 1955); *Abbott v. City of Los Angeles,* 50 *Cal.* 2d 438, 326 *P.* 2d 484, 493 (*Sup. Ct.* 1958). This we gather additionally from *Talbott v. Independent School District,* 230 *Iowa* 949, 299 *N. W.* 556, 566–567, 137 *A. L. R.* 234 (*Sup. Ct.* 1941); *Harvey v. Retire-*

ment Board, 392 Pa. 421, 141 A. 2d 197, 203 (Sup. Ct. 1958); Newcomb v. Ogden City Public School Teachers' Retirement Comm'n, 121 Utah 503, 243 P. 2d 941, 945–946 (Sup. Ct. 1952); Bakenhus v. City of Seattle, supra, 296 P. 2d, at p. 540.

Moreover, even as to the disposition of the fund itself, the contract concept is cumbersome. What happens if the plan is unsound, so that little or nothing will remain for those presently contributing? May there be a judicial receivership and some equitable proration if all parties to the plan cannot agree upon a program of rehabilitation? As a practical matter, legislative intervention is the only sensible approach. The California cases cited in the paragraph above recognize a legislative power of revision, with the proviso that a benefit that is taken away is reasonably offset by something added. True the needed power in the Legislature to revise a plan without the consent of the parties to the "contract" could be said to be "implied," but it seems odd to say the State may unilaterally rewrite its own contract or rewrite contracts between its municipal agents and others. We think it more accurate to acknowledge the inadequacy of the contractual concept.

In any event, we think it is clear that even in the "contract" jurisdictions, there would be little doubt as to the power of the Legislature to deal with an insolvent fund in the way in which our Legislature has dealt with the funds before us.

This of course does not mean that the Legislature may not recognize a moral obligation to provide public funds in aid of an insolvent plan. Our Legislature has in fact accepted a considerable measure of responsibility for the errors of predecessors with respect to the pension funds here involved and other pension programs as well. But we are satisfied that we should not surprise the Legislature with a decision that it heretofore imposed immutable obligations upon some 200 municipalities to underwrite the solvency of plans with liabilities running into several hundred millions of dol-

lars notwithstanding a long line of cases which assured it that its enactments would remain within its power to revise. The responsibility for creating public contracts is the Legislature's. A commitment of that kind should be so plainly expressed that one cannot doubt the individual legislator understood and intended it.

The judgment is affirmed. No costs.

*For affirmance* — Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For reversal*—None.