735 A.2d 52 (1999)
324 N.J. Super. 264
Karleen LaSALLA, Plaintiff
v.
Alfred LaSALLA, and the Board of Trustees of the Police and Firemen's Retirement System, Defendants.
Superior Court of New Jersey, Chancery Division, Family Part, Hudson County.
Decided April 28, 1999.
*53 Richard Seltzer, Hoboken, for plaintiff.
Gregory Farmer, Union City, for defendant Alfred LaSalla (Farmer & Campen, attorneys).
Susanne Culliton, Deputy Attorney General, for defendant Board of Trustees of the Police and Firemen's Retirement System (Peter Verniero, Attorney General of New Jersey, attorney).
DePASCALE, J.S.C.
This case requires the Court to determine the appropriate limit of its authority when distributing a Police and Fire Retirement System (hereinafter PFRS) pension between divorcing spouses.
The plaintiff and defendant married on May 18,1968. Three children were born to the parties. They are all emancipated. After twenty eight years of marriage Mrs. LaSalla filed for divorce on February 14,1996.
At the time of his marriage to the plaintiff the defendant had been employed as a Jersey City Police officer for one year.[1] In 1970, without a break in service, the defendant transferred his employment to *54 the Jersey City Fire Department. He continues in that employment to date having, at the age of fifty-two, attained the rank of Deputy Chief. His annual salary is slightly in excess of $98,000.00. He is more than a decade away from mandatory retirement and has no present plans to retire.
Plaintiff was a full time mother and housewife from the date of the marriage through September 1984. Over the course of this lengthy marriage the plaintiff bore three children. During their infancy she remained at home, dutifully and faithfully performing in her chosen role as mother and wife. She re-entered the work force in 1984 when her youngest child began his schooling. She also attempted to improve her employment prospects by furthering her education. Unfortunately, for a number of reasons, she was unable to complete even an associate degree at a community college. Her full time employment and contribution to the financial well being of her family continued until 1994 when she lost her job due to downsizing by her employer. Since that time her employment has been sporadic and at very modest compensation. She is a high school graduate with limited job skills facing the future with little chance of meaningful employment. At age 51, after a twenty-eight year commitment to this marriage, all that stands between her and life at the poverty level is her right to equitable distribution and claim for alimony.
During the marriage only two assets of significance have been acquired, the marital home and the defendant's PFRS pension. Excluding the defendant's pension the parties net worth is just slightly in excess of $12,000.00. The defendant's pension has a fixed value, as of the date of filing, of $669,000.00.[2]
On April 16,1997, plaintiff's attorney filed a motion, pursuant to R.4:48-1, to join the PFRS as a party to the action. The matter was adjourned at the request of PFRS on May 1, 1997. On August 1,1997 the plaintiff filed a motion seeking a lump sum or other equitable distribution of her interest in the defendant's PFRS pension. The motions were consolidated for hearing and oral argument was held on October 3, 1997. Following argument the court joined PFRS as a party to the action and ordered a plenary hearing on the issue of the distribution of the defendant's pension.[3] The plenary hearing was held on May 21,1998.
Resolution of the issues presented by the plaintiff's request requires an examination of the interrelationship between N.J.S.A. 2A:34-23, providing for the equitable distribution of property upon divorce and N.J.S.A. 43:16A-1, et seq., establishing a retirement system for the police and fire personnel of this state. Whether, and to what extent, such an interrelationship exists can best be determined by consideration of the reasons for, as well as the meaning of, each enactment. In that regard, it is essential that the relevant historical and policy considerations underlying each statute be addressed. Matawan Borough v. Monmouth Cty. Tax Bd., 51 N.J. 291, 299, 240 A.2d 8 (1968); Page v. Johnson, 45 N.J.Super. 97, 108, 131 A.2d 522 (Ch.Div.1957).

Police and Fire Retirement System
Our Courts have frequently been called upon to set forth the policies underlying *55 public pension legislation. See Eyers v. State of N.J., Bd. Of Trustees of PERS, 91 N.J. 51, 449 A.2d 1261 (1982) (Strong legislative policy in favor of providing for dependents of public employees); Uricoli v. Police & Fire Retirem. Sys, 91 N.J. 62, 449 A.2d 1267 (1982) (A fundamental purpose underlying the pensioning of civil servants is to secure good behavior and the maintenance of reasonable discipline during service); Masse v. Public Employees Retirem. Sys, 87 N.J. 252, 432 A.2d 1339 (1981) (A primary objective in establishing public pensions is to induce able persons to enter and remain in public employment, and to render faithful and efficient service while so employed); Spina v. Consolidated Police, etc., Pension Fund Com., 41 N.J. 391, 197 A.2d 169 (1964) (To permit the employer to release an aged servant who cannot decently be let out if he is unable to meet the necessities of life); Plunkett v. Bd. Of Pension Com'rs of City of Hoboken, 113 N.J.L. 230, 173 A. 923 (1934) (A basic consideration is that a guarantee against want, when the years of productivity have ended, will heighten the morale of workers and enhance the quality of the service rendered).
While the policy considerations expressed have always been sound, the same cannot be said for the funding mechanisms intended to secure the obligations undertaken. A financial crisis in the mid 1940's, driven by under funding of then existing local plans, brought about significant change in police and fire pension plans.[4]
The Police and Fire Retirement Act, (L. 1944, c. 255), created a statewide pension system for full time police and firemen designed to ensure the uniform protection of all such public officers through the medium of pensions payable from a fund maintained upon a sound actuarial basis. Seire, et al. v. Police & Fire Pension Commission of Orange, et al., 6 N.J. 586, 591, 80 A.2d 97 (1951). Given the importance of the obligations it secures, the financial integrity of the fund has been a major concern of our Legislature for over fifty years.
Pursuit of actuarial soundness was not without consequence to the structure and operation of the PFRS. Recognizing their goal could not be achieved without addressing the substantial unfunded liabilities of the prior systems, the Legislature amended the act in 1952 (L. 1952 c. 358) to consolidate all prior police and fire pension funds with the PFRS. The newly consolidated fund was required to reach the goal of actuarial soundness by amortizing its unfunded liability over a thirty year period. Two thirds of the amount necessary to retire the debt was assessed against the effected municipalities and the remainder assumed by the State. Spina, 41 N.J.at 397, 197 A.2d 169.
The basic funding mechanism of the PFRS remains largely unchanged since 1952. The contributions to the system come from three sources. First, the individual employee is required to contribute 8.5% of his/her compensation to the fund. N.J.S.A. 43:16A-15(2). Second, the employer of the member makes both a "normal contribution" and an "accrued liability contribution". N.J.S.A. 43:16A-15(4),(7); N.J.S.A. 43:16A-15(9). Finally, the State is required to make an "accrued liability contribution" and to appropriate and pay to the system annually an amount equal to 1.1% of the compensation of the members of the system for each valuation year. N.J.S.A. 43:16A-15(9); N.J.S.A. 43:16A-15(14)
The monies so collected are then credited to one of four accounts maintained by the PFRS pursuant to N.J.S.A. 43:16A-16, and thereafter managed and invested pursuant to N.J.S.A. 43:16A-14. The testimony of PFRS's witness at the hearing established that while not having completely *56 amortized the accrued liability of the system, substantial progress has been made.[5]
It is also worthy of note that in addition to the contributions and investments of the PFRS, the structure of the fund has also played a role in the reduction of its unfunded liabilities. PFRS was and is structured as a "pooled" annuity, defined benefit fund. The only assets of the system directly attributable to an individual member are his/her employee contributions. The remaining assets are "pooled" for the benefit of all the system's members. The choice of a pooled annuity served three distinct purposes here. First, due to its very substantial unfunded liabilities, pooling provided PFRS with the ability to meet its immediate obligations as if fully funded. It thereby avoided a reduction or elimination of benefits to its members. Second, it bought the Legislature the time it required to retire the system's accrued liability. Finally, classifying the benefit as an annuity permitted the PFRS to retain, as an asset, the unexpended portion of anticipated benefits payable to a member who died prior to reaching his life expectancy. N.J.S.A. 43:16A-16(4). This provision, in effect,allowed these funds to be recycled for the benefit of all members.
The most significant amendment to the PFRS statute subsequent to 1952 was L.1967, c. 250 (N.J.S.A. 43:16A-12.1) which established what has become known as the "widows pension". This act repealed section 12 of L.1944, c. 255 (N.J.S.A 43:16A-12) which provided members of PFRS with the right to elect optional forms of retirement. Among the options available to a member under section 12 was a survivor annuity to a designated beneficiary. This form of retirement was available to the member if he or she was willing to accept a reduction of his or her post retirement benefits. The "widows pension" provided a life annuity to the surviving spouse of a member without an increase in the members contributions or a reduction in his or her benefits post retirement.
In addition to the increased benefits derived by PFRS members, the amendment also served to distinguish PFRS from the two other major state systems, the Public Employees Retirement System, N.J.S.A. 43:15A-1, et seq. (hereinafter PERS),and the Teachers Pension and Annuity Fund, N.J.S.A. 18A:66-1, et seq. (hereinafter TPAF). Both PERS and TPAF continue to provide optional forms of retirement which include survivor annuities at a cost of reduced post retirement benefits to the member. See N.J.S.A. 43:15A-50; N.J.S.A. 18A:66-47. While it is presumed that the designated beneficiary in such cases would ordinarily be the surviving spouse, the choice is left to the individual member. On the contrary, the PFRS "widows pension" is payable only to a surviving widow or widower.
N.J.S.A. 43:16A-1(23) provides in pertinent part as follows:
"Widower" shall mean the man to whom a member or retirant was married at least one year before the date of her death and to whom she continued to be married until the date of her death and who has not remarried.(emphasis added)
N.J.S.A. 43:16A-1(24) provides in pertinent part as follows:
"Widow" shall mean the woman to whom a member or retirant was married at least one year before the date of his death and to whom he continued to be married until the date of his death and who has not remarried.(emphasis added)
By creating an independent right to a pension in a qualifying spouse over which the member has no control, Seavey v. Long, 303 N.J.Super. 153, 158-59, 696 A.2d 102 (App.Div.1997), the Legislature clearly and unmistakenly demonstrated an intent to provide for the future financial security of a dependent spouse surviving a PFRS member. Further, since the additional *57 benefits were provided without an adjustment to the funding mechanism, it is clear that the Legislature intended to subordinate actuarial soundness to the accomplishment of this specific, significant public purpose.
The amendment should not be viewed in isolation. Since a surviving spouse and an ex-spouse have enjoyed the same relationship with the member and have the same need for financial security, it is fair to assume the Legislature had a reason for providing for one and excluding the other. The basis for the exclusion was a pragmatic one. One becomes an ex-spouse in one of only two ways, through death or divorce. Insofar as death would obviate the necessity of providing the benefits here involved, the impact of divorce was clearly the relevant consideration. Support for this proposition can be found by further examination of the history of the 1967 session of the Legislature.

Divorce Reform
Six months prior to the enactment of the "widows pension" amendment to the PFRS statute the Legislature established a commission to study and recommend revisions to the divorce laws of this state. L. 1967, c. 57. In its preamble the Legislature set forth its motivation for the enactment:
" Whereas, in 1907 there was a general revision of the statutory laws of the State relating to divorce and nullity of marriage and related matters which followed a recommendation for a uniform divorce act, made by a conference of delegates from the States, including New Jersey; and
Whereas, Except for a statute passed in 1923, making extreme cruelty a ground for divorce, there has been no particular consideration given to this subject matter; and
Whereas, It has become increasingly evident that modern concepts in respect to divorce and nullity of marriage, and the sociological aspects of marriage, including many changes in viewpoint that require legislative investigation and study, and revision of the law; and
Whereas, the New Jersey State Bar Association has petitioned for legislative action in this regard; now therefore,...." (emphasis added)
Consistent with this mission paragraph 4 of the act charged the Commission as follows:
" It shall be the duty of the Commission to study and review the statutes and court decisions concerning divorce and nullity of marriage and related matters, particularly as contained in Title 2A of the New Jersey Statutes as amended and supplemented and other legislative enactments, relating to the said subject matter And to study the advisability and practicality of creating A family law court." (emphasis added)
Thereafter, in paragraph 8, the act required the commission to report its findings and recommendations to the Governor and Legislature on or before July 1, 1968.
New Jersey was far from alone in its quest to modernize its divorce laws. The movement towards modernization was truly nationwide. Between 1969 and 1977 more than half of all the states adopted some form of no-fault based divorce reform. By 1989 forty nine states had done so. Twenty-three states had, between 1971 and 1982, included provisions for the distribution of marital property among their reforms. Wardle, No Fault Divorce and the Divorce Conundrum, 1991 B.Y.U.L.Rev. 79, 87-88. Although the Legislature had provided the commission with a year to consider and report its findings and recommendations the act was twice amended to extend the deadline.[6] The final report to the Governor and Legislature was submitted on May 11, 1970. *58 Although not included in the Commission's report, its proposed divorce reform bill, or in the bill as originally introduced, the resulting statute, L. 1971, c. 212, provided for the equitable distribution of property between divorcing spouses. Painter v. Painter, 65 N.J. 196, 207, 320 A.2d 484 (1974). Not surprisingly the Supreme Court was quickly called upon to consider the constitutionality of the statute and the intent of the Legislature regarding its implementation by the Courts. It did so in a series of four cases decided on the same day. Scalingi v. Scalingi, 65 N.J. 180, 320 A.2d 475, (1974); Chalmers v. Chalmers, 65 N.J. 186, 320 A.2d 478 (1974); Painter v. Painter, supra; Rothman v. Rothman, 65 N.J. 219, 320 A.2d 496 (1974). Most relevant here is that portion of the Rothman opinion, at pg. 228-29, 320 A.2d 496, which sets forth the public policy underlying equitable distribution of marital property:
" The statute we are considering authorizes the courts, upon divorce, to divide marital assets equitably between the spouses. The public policy to be served is at least twofold. Hitherto future financial support for a divorced wife has been available only by grant of alimony. Such support has always been inherently precarious. It ceases upon the death of the former husband and will cease or falter upon his experiencing financial misfortune disabling him from continuing his regular payments. This may result in serious misfortune to the wife and in some cases will compel her to become a public charge. An allocation of property to the wife at the time of the divorce is at least some protection against such an eventuality. In the second place the enactment seeks to right what many have felt to be a grave wrong. It gives recognition to the essential supportive role played by the wife in the home, acknowledging that as homemaker, wife and mother she should clearly be entitled to a share of family assets accumulated during the marriage. Thus the concept of marriage is a shared enterprise, a joint undertaking, that in many ways it is akin to a partnership. Only if it is clearly understood that far more than economic factors are involved, will the resulting distribution be equitable within the true intent and meaning of the statute." (emphasis added)
Given the scope of the reformation of the divorce laws and the limited application of the "widow's pension"amendment, it is not surprising that one came sooner than the other. However, the Court's pronouncement in Rothman, supra, established that the policies underlying each enactment were substantially similar. Neither the absence of legislative history regarding the inclusion of equitable distribution in the divorce reform act, L.1971, c. 212, nor the separation in time between enactments diminishes their interrelationship. Unless one is willing to accept the proposition that the Legislature capriciously plucked the concept from thin air and, without due consideration, enacted it, it is reasonable to assume that concern for the financial security of a divorcing spouse was a vital part of the modernization of our laws envisioned by the Legislature when it created the Commission in 1967. Further, the separation in time is accounted for by the multitude of other issues addressed in the divorce reform legislation. cf. Portner v. Portner, 93 N.J. 215, 219, 460 A.2d 115 (1983)
Both the "widows pension" and the equitable distribution provisions of the divorce statute provide for the financial security of a spouse transitioning from dependence to independence. In the former instance it is accomplished by legislative directive to the PFRS. In the latter instance by a grant of authority to the court. The triggering event is relevant only insofar as it determines who will act to carry out the Legislative intent and through which mechanism.

Equitable Distribution
A trial court in considering a request for equitable distribution of marital *59 property under N.J.S.A. 2A:34-23 must undertake a three step process first enunciated by our Supreme Court in Rothman, supra at 232-33, 320 A.2d 496:
"Assuming that some allocation is to be made, he must first decide what specific property of each spouse is eligible for distribution. Secondly, he must determine its value for purposes of such distribution. Thirdly, he must decide how such allocation can most equitably be made."
It is well settled in this state that the portion of a spouse's pension which was acquired during coverture qualifies as marital property subject to equitable distribution upon divorce. Moore v. Moore, 114 N.J. 147, 155, 553 A.2d 20 (1989); Whitfield v. Whitfield, 222 N.J.Super. 36, 47, 535 A.2d 986 (App.Div.1987); Kikkert v. Kikkert, 177 N.J.Super. 471, 475, 427 A.2d 76 (App.Div.1981); aff'd o.b., 88 N.J. 4, 438 A.2d 317 (1981); Weir v. Weir, 173 N.J.Super. 130, 133-35, 413 A.2d 638 (Ch. 1980). The defendant does not contest the eligibility of his pension for distribution, its valuation at $669,000.00, the determination of plaintiff's share at $334,500.00, or the manner of distribution proposed. PFRS takes no position on eligibility or valuation of the pension. While there is no apparent conflict over the value assigned to the defendant's pension, discussion of valuation is useful as well as necessary.
The second step in the Rothman process, the valuation of the defendant's pension, is both difficult and complex. While neither party disputes the value fixed by PFRS for the pension, a closer look is required if the court is to effect an equitable, as opposed to a practical, distribution.
The defendant here is entitled to a defined benefit life annuity upon his retirement. All but one of the elements necessary to value his pension under present methodology are capable of precise determination as of the date of filing of the complaint. The most significant factor involved, the length of defendant's post retirement life, cannot be ascertained with precision. Since that factor must be included in the computation of value, our court's have adopted a pragmatic methodology employing actuarial data to supply an acceptable life expectancy for valuation purposes. While perhaps the only practical methodology available, we should not loose sight of the fact that it represents only our best guess at a crucial evaluation factor. The speculative nature of such a valuation process requires particular attention be paid to the terms of the plan involved and the method of distribution employed. It is here, on the third step in the Rothman, supra, process, that PFRS and the parties are at odds. PFRS argues that any distribution other than one specifically provided for pursuant to N.J.S.A. 43:16A-1 would undermine the financial integrity of the system and would exceed the legislative grant of authority to the court contained in N.J.S.A. 2A:34-23.
Over the years our courts have utilized several methods for the equitable distribution of pensions. The most common of these methods are immediate offset, deferred distribution, and partial deferred distribution. Moore, supra, 114 N.J. at 158-161, 553 A.2d 20. These terms appear nowhere in the statute which authorizes the court to equitably distribute property between divorcing spouses. Rather the courts, exercising the grant of legislative authority found in the statute, have devised and implemented them. These methods are therefore illustrative of, and not limitations upon, the court's authority in this regard. If utilization of these methods will not produce the required equitable distribution of the parties assets the court is required to fashion a method which will.
While immediate offset is the favored form of distribution, Moore, supra, 114 N.J. at 162, 553 A.2d 20, its use to distribute a matured PFRS pension will generally result in injustice to the member spouse. The degree of injustice is proportional to its valuation. Here its use would require *60 the defendant to pay over to the plaintiff $334,500.00 in available assets. The plaintiff would thus be guaranteed receipt of her full distributive share which she could utilize immediately. Additionally, those assets would pass to her without negative tax consequences. Conversely, the defendant would have no present access to or guarantee that he will ever receive any portion of his pension. Further, that portion he receives will be taxable to him as income. While the tax treatment can be ameliorated by discounting for anticipated tax consequences, the same cannot be said with regard to the unequal sharing of risk between the parties.
Plaintiff acknowledges the parties do not have sufficient assets to affect an offset of her claim against the pension. However, in light of the fact that she has requested the court consider a distribution of her share of the defendant's matured pension prior to his retirement, the court must consider whether such a variant form of immediate payout is possible and/or equitable.
There is a vast difference between an immediate offset of plaintiff's distributive share and its immediate payout. The former is accomplished with non-system assets while the latter requires distribution from funds maintained by PFRS. Research discloses no precedent in New Jersey which would support the plaintiff's request. However, while uniformly denying access to system funds, several of our sister states have adopted a variant form of immediate payout. Furia v. Furia, 692 A.2d 327 (R.I.1997),(Furia II); Furia v. Furia, 638 A.2d 548 (R.I.1994),(Furia I); Gillmore v. Gillmore, 29 Cal.3d 418, 629 P.2d 1, 174 Cal.Rptr. 493 (1981); Rowe v. Rowe, 24 Va.App 123, 480 S.E.2d 760 (1997). Under this variant form of immediate distribution the member spouse is required to pay the distributive share of his/her pension to the non-member spouse in regular installments out of current, pre-retirement income. While addressing certain of the issues raised by a request for an immediate payout from a public pension system this method has been criticized for two principal reasons. First, payments from the member spouse's current income for equitable distribution are taxable to him/ her and tax free to the recipient. Second, the substantial amount of current net income required to satisfy the obligation would in many cases force the payor into an involuntary retirement. See: Ray, 1997 Survey of Rhode Island Family Law, 3 Roger Williams U.L.Rev. 508 (1997). The evident inequity to the payor spouse renders this form of distribution unacceptable.[7]
The absence of an approved immediate payout methodology does not mean such a remedy cannot be fashioned by the court. However, resort to such extraordinary relief should be limited to those instances where its absence would deny the applicant his/her right to equitable distribution, and then only if it would not undermine the financial integrity of PFRS. Having ruled out the immediate offset of plaintiff's interest, the Court must consider whether an existing form of deferred distribution would produce an equitable result.
Bearing in mind that the asset under consideration takes the form of a life annuity, the element of risk inherent in the deferral of plaintiff's interest cannot be ignored. At the time of the judgment of divorce the Court will distribute the anticipated value of the asset between the parties. The actual value will remain speculative and will be determined by the *61 defendant's longevity. The defendant's untimely death could greatly reduce or totally eliminate the benefits actually received by the plaintiff. There is no injustice in requiring the plaintiff to share in that risk during the marriage since the "widows pension" provides an adequate safety net. So long as she remains married to the defendant the Legislature has provided for her financial security. On the contrary, in the absence of survivor's benefits of any kind, to require a divorcing spouse to accept the risk of elimination of benefits from such an asset is unconscionable. If the death of a member spouse ends a dependent spouse's right to alimony and eliminates his/her distributive share of the pension asset, he/she will likely fast become a public charge. Such an outcome cannot have been envisioned or intended by the Legislature as a means of rectifying the "grave wrong" visited upon a dependent spouse as a consequence of divorce. Therefore, unless the dependent spouse's distributive share is fairly secured prior to and following the retirement of the member spouse, deferral cannot result in an equitable distribution within the meaning of the statute.
PFRS here suggests that life insurance is the only form of security available to the plaintiff. Pre-retirement they suggest the Court order the defendant to designate the plaintiff as a beneficiary, to the extent of her interest, on his employment related insurance. Post-retirement security would be available by virtue of the defendant's right to convert his employment related insurance to a private policy as provided by N.J.S.A. 43:16A-58.
The fundamental problem with PFRS's position is the assumption that the defendant/member may properly be burdened with the obligation of guaranteeing the plaintiff's receipt of her distributive share of the pension. While the distinction between alimony and equitable distribution is often blurred in the amalgamation of interests a final judgement of divorce represents, on this point maintenance of the distinction is important.
Alimony is a continuation of the supporting spouse's duty to support the dependent spouse and grows out of the marital relationship. Greenberg v. Greenberg, 126 N.J.Super. 96, 100, 312 A.2d 878 (App.Div.1973). Since the obligation is personal to the supporting spouse he/she may, as the obligor, be required to secure the obligation. Davis v. Davis, 184 N.J.Super. 430, 436, 446 A.2d 540 (App. Div.1982). Finally, the allowance of alimony does not confer upon the receiving spouse any interest in the assets of the paying spouse. Mendell v. Mendell, 162 N.J.Super. 469, 475, 393 A.2d 600 (App. Div.1978).
Equitable distribution is conceptually based upon the theory of marriage as a partnership or joint enterprise, Rothman, supra at 229, 320 A.2d 496, where the assets accumulated during the marriage are considered and distributed as the fruits of the joint undertaking of the parties regardless of the state of title. Painter, supra at 213, 320 A.2d 484. It does not create or recognize an individual obligation due one spouse from the other. Rather, its sole purpose is to identify the legal and equitable interests of the parties in jointly owned assets and divide them accordingly. Neither party's receipt of an "award" of equitable distribution carries with it a duty to insure the other's receipt of his/her distributive share.
Practical considerations also render a personal guarantee of plaintiff's distributive share by the defendant patently unfair. First and foremost is the fact that defendant himself enjoys no such guarantee. An untimely death would deprive him of any benefit while the plaintiff would receive her full share. Second, post-retirement conversion of existing insurance or the purchase of a new policy would require the defendant to utilize a substantial portion of his distributive share to guarantee the plaintiff full enjoyment of her share. *62 Such a requirement would destroy the equity of the underlying distributive scheme. Finally, the purchase of insurance in such a large benefit amount by a person of advanced age engaged in a dangerous profession is likely to be cost prohibitive. Therefore the defendant cannot legally or equitably be required to insure the plaintiff's interest.
Adjustments to the distributive scheme in recognition of the plaintiff's insurable interest in the defendant's life result in similar inequities. Any diminution of the defendant's interest for this purpose mitigates but does not eliminate the inequities heretofore discussed. Alternatively, requiring plaintiff to pay for the insurance of her interest presents her with a true Hobson's choice: should she accept near poverty for the foreseeable future or risk becoming destitute later in life?
The fact that insurance does not provide acceptable security does not end the inquiry. A more fundamental question remains to be answered: Is the plaintiff's interest secured by operation of law? Unless we are prepared to renounce Rothman, supra, and revert to a title based system of property division upon divorce, that question must be answered in the affirmative.
When the Legislature eliminated the optional forms of retirement available to PFRS members in favor of the "widow's pension" and established a right to equitable distribution upon divorce, it fundamentally altered the relationship between PFRS and its members. Prior to the advent of equitable distribution, the entire relationship between PFRS and its members was based upon title. A members ownership interest and right to receive benefits was determined solely under the provisions of the PFRS statute. The exemption of the members benefits from levy and sale, garnishment, attachment, or any other process pursuant to N.J.S.A. 43:16A-17 stood as a formidable barrier to any claim against the fund by a non-member. As between divorcing spouses, that barrier was removed with the passage of the equitable distribution statute.
Cleveland v. Bd. of Trustees, Police and Firemen's Retirement System, 229 N.J.Super. 156, 550 A.2d 1287 (App.Div. 1988), established the right of a divorced, non-member spouse to receive direct payments from PFRS to satisfy her claim for equitable distribution of her spouse's pension. There the court based its analysis not on the PFRS statute, which contains neither authorization nor bar to such a distribution, but upon the principles underlying equitable distribution. Cleveland, supra, demonstrates that the Court's authority to equitably distribute a PFRS pension upon divorce is not limited by the four corners of the PFRS statute.
While Cleveland, supra, identified and resolved some of the issues relating to the equitable distribution of a PFRS pension, others remain. Principle among these is, precisely what is encompassed in an award of equitable distribution of a mature PFRS pension? Does the Court award a non-member a share of the members pension or divide a joint asset between its owners?
PFRS's position here is that the plaintiff's award of an interest in the defendant's pension at equitable distribution is limited to a dollar amount subject to the life expectancy and decision making of the titled, statutory owner. Construction of the statutes in that manner would violate generally accepted principles of statutory construction. While acknowledging the apparent conflict between these enactments, they ignore the possibility of their reconciliation and suggest an interpretation that would substantially undermine the equitable distribution statute.
The court's duty is to reconcile legislative enactments dealing with the same subject matter, and to give effect to both expressions of legislative will if it is possible to do so. Scancarella v. Department of Civil Service, 24 N.J.Super. 65, 71, 93 A.2d 637 (App.Div.1952); Furlong v. Board of Com'rs of Town of Nutley, 15 *63 N.J.Super. 541, 546, 83 A.2d 652 (Law Div.1951). This is so because the legislative mind is presumed to be consistent, Allgaier v. Woodbridge Tp., 5 N.J.Super. 21, 25, 68 A.2d 326 (App.Div.1949), and when divers laws are made relating to one subject, the whole must be considered as constituting one system, and each enactment mutually connected to the other. Vroom v. Smith, 14 N.J.L. 479 (1834). An interpretation of the statutes consistent with the concept of equitable distribution envisioned by the Legislature while posing no threat to the financial integrity of PFRS is not only possible, it is simple.
PFRS here correctly asserts that plaintiff's rights cannot, by virtue of an award of equitable distribution, be enhanced beyond those of the defendant. What that position fails to take into account is that the legislatively created right to equitable distribution renders them equal to and independent from those of the defendant as they relate to her distributive share. Her rights are, for all intents and purposes, identical to his with one legislatively imposed limitation. They are limited to her share of that portion which was "acquired during the marriage".
What the plaintiff receives at equitable distribution is more than simply a determination of her maximum benefit. Her distributive share is accompanied by the same bundle of rights and limitations the defendant retains as to his share. She, in effect, becomes a limited member of the PFRS. Her share is truly distributed to her.
Consequently, since the defendant is not entitled to a lump sum distribution of his pension benefits, neither is the plaintiff. Should the plaintiff choose to withdraw her share of the contributions and waive the pension, she would receive only her proportionate share of the contributions made during coverture. If she chooses to receive the pension, she receives a life annuity, payable in monthly installments, capped by her distributive share, $334,500.00.
Such an interpretation poses no threat to the financial integrity of the PFRS. The history of PFRS reveals that the payment of benefits has not had any correlation to their level of funding since its inception in 1944. Full benefits were provided to retiring members when their funding level was substantially less than it is today. The record also discloses that no adjustment to the funding mechanism was made in order to provide the greatly enhanced benefits to members following the 1967 amendments. Yet, throughout the years, the fund has steadily increased its funding level and anticipates 100% funding in the foreseeable future.
PFRS's argument, that an interpretation recognizing the independence of the plaintiff's distributive share could require the system to pay out more money than one which maintains its dependence upon the members life, merely states one of a number of obvious possibilities. It completely fails to quantify its impact upon the fund. While all payments from the fund effect it financially, not all payments effect its financial integrity. A simple and undisputed fact disclosed on this record is that PFRS has planned, invested and today stands ready to pay out, without consequence to the fund, the defendants entire benefit amount. The remote possibility that a potential remainder may be lost to them if the plaintiff's share is deemed to be independent from the defendant's does not effect the system's financial integrity at all. Even if there was some effect on the fund, its minimal impact on this massive fund must be weighed against the plaintiff's right to equitable distribution and the likelihood of her destitution if it is denied to her. On balance that scale tips heavily in favor of the plaintiff, not only because it reinforces the intent of the Legislature, but because it does so while maintaining the integrity of the fund.
For all of the foregoing reasons, the plaintiff's distributive share of the PFRS pension is fixed at $334,500.00. At the plaintiff's direction PFRS shall, given the *64 mature status of this pension and subject to the provisions of N.J.S.A. 43:16A-16.2, commence monthly installment payments to her and continue the same for the remainder of her life or until the maximum benefit set forth above has been paid to her, whichever comes first.
NOTES
[1] The defendant's month of enrollment in the PFRS was stipulated between the parties as May of 1967
[2] Two evaluations of the defendant's pension were submitted to the court. Plaintiff's expert performed his valuation in all respects in a manner similar to that employed by PFRS with the exception of the calculation of defendant's life expectancy. Plaintiff's expert utilized the Pension Benefit Guarantee Corporation's mortality table where the PFRS used a life annuity factor table based on its actual experience in administering the fund. Since the table based on the actual experience of the fund is likely to yield a more accurate valuation this court has adopted the PFRS valuation of $669,000.00.
[3] The order embodying the court's decision of October 3,1997 was signed on December 1, 1997. On December 17,1997 PFRS filed a motion for reconsideration of the court's October 3,1997 ruling. The motion was denied on January 28,1998.
[4] The history of police and fire pension funds prior to the establishment of PFRS is set forth at length in Spina v. Consolidated Police, etc. Pension Fund Com., 41 N.J. 391, 393-96, 197 A.2d 169 (1964).
[5] Thomas Bryan, Deputy Director of the Division of Pensions, testified that PFRS had, as of June 1996, over 12 billion dollars in assets and was 89.97% funded.
[6] L. 1968, c. 170 extended the commissions deadline to July 1, 1969. A second and final amendment, L. 1969, c. 25, extended the deadline to January 13, 1970.
[7] The Rhode Island Supreme Court's treatment of the tax considerations involved in Furia, supra, at 328, consisted of the following single sentence:

" The defendant will pay taxes on the monthly payments received from plaintiff."
Since the court failed to discount the payments from the payor to the payee the ruling would appear to be in direct contravention of I.R.C. Subsection 71(a), 215(a) (1996), providing that alimony, as opposed to equitable distribution payments, are deductible to the payor and taxable to the payee.